Vivienne RABIDUE, Plaintiff,

v.

**OSCEOLA REFINING COMPANY, A DI-
VISION OF TEXAS–AMERICAN PE-
TROCHEMICALS, INC., Defendant.**

No. 79–40258.

United States District Court,
E.D. Michigan, S.D.

April 18, 1984.

Barbara A. Klimaszewski, Saginaw, Mich., for plaintiff.

Seth M. Lloyd, Detroit, Mich., for defendant.

### MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

## I INTRODUCTION

This is an employment discrimination action brought by Vivienne Rabidue against the Osceola Refining Company. Ms. Rabidue has asserted claims of sex discrimination and sex harassment under Title VII of the 1964 Civil Rights Act[1] and the Michigan Elliott Larsen Act.[2] Plaintiff Rabidue also has asserted a claim under the federal Equal Pay Act.[3]

The liability issues came on for trial by the bench on May 3, 1983, and concluded on May 7, 1983. The Court heard the testimony of several witnesses and admitted numerous exhibits. The de bene esse depositions of Charles A. Muetzel and Robert A. Fitzimmons also were admitted.

The evidence and the governing legal principles have been reviewed. Findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure are made herein.

## II FINDINGS OF FACT

Plaintiff was hired by Osceola Refining Company in December of 1970. At the time, Osceola was an independently owned company. In 1974, United Refineries of Warren, Ohio purchased Osceola and operated it as a separate division.

On September 1, 1976, Osceola was acquired by Texas American Petrochemicals. It is noted that Texas American is the defendant in this lawsuit.[4]

The position for which plaintiff was hired and which she initially occupied was Executive Secretary. In this position, plaintiff performed a variety of duties including typing, fielding telephone calls and bookkeeping.

In 1973, plaintiff was promoted to the position of Administrative Assistant. This enabled plaintiff to become a salaried—rather than hourly—employee. Plaintiff also enjoyed other advantages as a result of the promotion including longer lunch

---

1. 42 U.S.C. § 2000e *et seq.*

2. M.C.L.A. § 37.2101 *et seq.*

3. 29 U.S.C. § 206(d).

4. The date that defendant acquired Osceola Refining Co. is relevant to defendant's successorship defense. *See* nn 5–8 and accompanying text *infra*.

hours and more liberal vacation entitlements.

The promotion brought plaintiff additional responsibilities and duties. Plaintiff was responsible for purchasing office supplies and dealing with customers. Plaintiff also was responsible for noting incoming governmental regulations and pertinent newspaper articles. Plaintiff then either filed these materials away or forwarded them to the appropriate person in the company.

Eventually, plaintiff was assigned additional duties the most important of which were those of credit manager and office manager. Plaintiff also had the responsibility of assigning work to a number of other Osceola employees. It is noted that plaintiff never produced convincing evidence that male employees in substantially equal jobs to the jobs occupied by plaintiff received greater remuneration than plaintiff.

A prominent character in the trial evidence was Douglas Henry. Mr. Henry was an Osceola employee working as a supervisor of the company's keypunch and computer operators. Occasionally, plaintiff's duties and Mr. Henry's duties intersected.

Mr. Henry was a crude and vulgar man. He habitually used vulgar language around the office. It was not unusual for him to make obscene comments about women, and to use words like "cunt," "pussy," and "tits." On at least one occasion Mr. Henry called plaintiff a "fat ass."

Plaintiff was annoyed by Mr. Henry's language. Other Osceola female employees also were annoyed by Mr. Henry's vulgarity. The vulgarity clearly was a problem, but not so pervasive a problem as to substantially interfere with plaintiff's employment. During the time plaintiff worked for Osceola, the company was aware of Mr. Henry's vulgarity, but was not successful in curbing it.

It also is noted that a number of other Osceola male employees occasionally displayed pictures of nude or partially clad women in their office and work areas. Plaintiff saw these pictures during many work days.

Plaintiff doubtless was an intelligent and ambitious person. These qualities were responsible for the 1973 promotion and the delegation to her of fairly important duties. On the other hand, plaintiff—on the whole—was a rather troublesome employee. Plaintiff's supervisor and the people with whom plaintiff dealt almost uniformly found plaintiff to be abrasive, extremely willful, and difficult to get along with. This was clearly reflected in the testimony of witnesses Muetzel, Fitzimmons, Shoemaker, Attinger and Martonosi.

Plaintiff argued with customers and yelled at other employees. In defiance of explicit instructions, plaintiff continued to contact individual terminal managers to ask for daily liftings. This practice jeopardized Osceola's relations with major oil companies. Furthermore, the Vice President of United Refineries—Osceola's largest customer—was particularly annoyed by plaintiff's rudeness.

As a result of plaintiff's many job-related problems—in particular, her inability to work harmoniously with customers and co-workers—Mr. Shoemaker decided once and for all that plaintiff would have to be discharged. The recommendation was accepted, and plaintiff's employment position was formally terminated as of January 14, 1977. Plaintiff's replacement as Administrative Assistant was a male.

Plaintiff filed her sex discrimination charge with the EEOC on or about March 9, 1977. In this respect, it also should be noted that the Court finds that prior to its September 1, 1976 acquisition of Osceola, defendant Texas American had no notice that plaintiff actually intended to pursue a claim of sex discrimination or sex harassment against the predecessor company, United Refineries.

## III  CONCLUSIONS OF LAW

As has been noted plaintiff has asserted the following claims: sex discrimination in violation of Title VII; sex discrimination in violation of the Elliott Larsen Act; sex

harassment in violation of Title VII; sex harassment in violation of the Elliott Larsen Act; and violation of the federal Equal Pay Act. In this portion of the opinion, a separate analysis of each of these claims will be made.

## A. *Plaintiff's Title VII Sex Discrimination Claim*

At the threshold, defendant has asserted a successorship defense. Pointing out that it did not acquire Osceola until September 1, 1976, defendant argues that it cannot be held liable for Osceola's alleged discrimination occurring prior to that date.

■ In the 1974 case of *EEOC v. MacMillan Bloedel*,[5] the Sixth Circuit Court of Appeals set out a nine-point totality of circumstances test for determining Title VII successor liability. Under this test, the following factors are to be balanced: (1) whether the successor company had notice of the charge; (2) the ability of the predecessor to provide relief; (3) whether there has been a substantial continuity of business operations; (4) whether the new employer used the same plant; (5) whether the new employer uses substantially the same work force; (6) whether the new employer uses substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same conditions; (8) whether the employer uses the same machinery, equipment and methods of production; (9) whether the employer produces the same product.[6]

The *MacMillan Bloedel* test seemed to be a balancing test. In 1978, however, the Sixth Circuit decided *Wiggins v. Spector Freight System*.[7] There, the Sixth Circuit held that a successor employer could not be held liable if (1) charges were not filed with the EEOC at the time of the acquisition and (2) the successor had no notice of the discrimination claims.[8] In this respect, it

must be noted that the *Wiggins* court explicitly stated that where these two conditions exist, the successorship claim is "removed from the rationale" of *MacMillan Bloedel*.[9] In light of this, the law must be interpreted as exonerating successors where these two conditions exist.

■ In applying *Wiggins*, the Court first notes that plaintiff had not filed EEOC charges at the time of the September 1, 1976 acquisition of Osceola by defendant. Next, the Court hearkens to its earlier findings that Texas American was not given notice of plaintiff's claim prior to its acquisition of Osceola. In light of these two Rule 52(a) fact findings, the Court is compelled to conclude that defendant cannot be held liable for any pre September 1, 1976 sex discrimination.

An analysis of plaintiff's Title VII disparate treatment sex discrimination claim is next. After studying the facts, it is determined that plaintiff has failed to prove that she ever was the victim of disparate treatment Title VII sex discrimination while employed by Osceola. Thus, even if the Court had ruled in favor of plaintiff on the successorship issue, plaintiff's Title VII sex discrimination claim would fail. The explanation follows.

Plaintiff's disparate treatment Title VII claim should be viewed as a claimed continuing violation of Title VII culminating in plaintiff's discharge. With respect to the factual elements of the discrimination occurring prior to the discharge, the Court has determined that the company did not direct sex based discriminatory conduct at plaintiff. These issues will, of course, be treated in detail in the sex harassment and Equal Pay Act portions [10] of this opinion. For now, however, it is merely concluded that the company's pre-discharge conduct toward plaintiff was not based on anti-fe-

---

**5.** 503 F.2d 1086 (CA 6, 1974).

**6.** *See id.* at 1094.

**7.** 583 F.2d 882 (CA 6, 1978).

**8.** *See id.* at 886.

**9.** *See id.*

**10.** The Title VII sex harassment claim is analyzed at nn. 31–55 and accompanying text *infra*. The Equal Pay Act claim is analyzed at nn 67–68 and accompanying text *infra*.

male animus. Absent such animus, there can be no violation of Title VII.[11]

Turning to plaintiff's discriminatory discharge claim, it is, of course, a classic disparate treatment claim bottomed on section 703(a)(1) of Title VII. In plain and simple terms, plaintiff is claiming that she was discharged because she is female.

The most recent Sixth Circuit case dealing with a discriminatory discharge is *Rasimas v. Michigan Department of Mental Health*.[12] *Rasimas*, a multi-faceted opinion,[13] clearly indicates that the *McDonnell Douglas*[14] model is to be applied in sex discrimination unlawful discharge cases. Applying this model in the present case, plaintiff Rabidue must show: (1) that she belongs to a protected Title VII classification; (2) that she was qualified for the Administrative Assistant position from which she was discharged; (3) that, despite her qualifications, she was discharged; (4) that, subsequent to her discharge, plaintiff was replaced by a male.

The Court finds that plaintiff satisfied the *McDonnell Douglas* prima facie case. The only element arguably in dispute is whether plaintiff was qualified for her position. In view of plaintiff's intelligence and experience, the Court believes plaintiff indeed was qualified to function as an Administrative Assistant. Thus, plaintiff has established a prima facie case.

■ As *Rasimas* points out, the next step in the disparate treatment analysis is to determine whether defendant articulated a legitimate non-discriminatory reason for the discharge. This step—established in the famous *Furnco*[15] and *Burdine*[16] Supreme Court cases—has been recently discussed by the Sixth Circuit in two cases. *Brooks v. Ashtabula County*[17] and *Sones Morgan v. Hertz*.[18] These two decisions make it clear that the disparate treatment defendant need only come forward with evidence of legitimate non-discriminatory reasons for the challenged employment decision. Thus, the second step of the disparate treatment analysis merely requires the defendant to produce evidence of—rather than prove—its non-discriminatory motive.

■ Beyond doubt defendant met this burden of production. As was mentioned in the fact section of this opinion, defendant produced numerous witnesses who testified that plaintiff was willful, rude and inclined not to follow company policies. This testimony easily satisfies the second prong of the Title VII disparate treatment analysis.

■ The final disparate treatment step focuses on the issue of pretext. The burden of proof is on plaintiff to show that the employer's asserted non-discriminatory reasons are pretextual. The term burden of proof means, of course, that the employee must show that, more likely than not, the asserted reasons for the employment decision are pretextual.[19]

11. *See generally EEOC v. Maxwell Co.*, 726 F.2d 282 (CA 6, 1984).

12. 714 F.2d 614 (CA6, 1983).

13. *Rasimas* also contained significant holdings on the issues of timely filing and mitigation of damages. *See* 714 F.2d 614, 620–622, 623–626. These two issues, of course, are not relevant to the present opinion.

14. In *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set out the allocation of proof burdens in the basic Title VII disparate treatment case. *McDonnell Douglas* is applied at pp. 622–623 of the *Rasimas* opinion. *See* 714 F.2d 614, 622–623.

15. *Furnco Construction Co. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

16. *Texas Department of Community Affairs v. Burdine*, 25 FEP cases 113 (1981).

17. 717 F.2d 263 (CA 6, 1983).

18. 725 F.2d 1070 (CA 6, 1984).

19. *See Sones Morgan v. Hertz Co.*, 725 F.2d 1070 (CA 6, 1984). The nature of the employee's pretext burden will be further clarified when the Supreme Court decides the *Westinghouse v. Vaughn* case. *See* 52 USLW 3033, 3659. The Supreme Court heard arguments on *Vaughn* during the week of March 19, 1984. *See* 51 USLW 3659. *See also* the *Vaughn* Eighth Circuit opinion at *Vaughn v. Westinghouse*, 702 F.2d 137 (CA 8, 1983).

The Court has concluded that plaintiff did not satisfy this burden. Plaintiff's strongest witnesses dealt with the issue of Mr. Henry's vulgarity and crudity. Very little evidence, outside of plaintiff's own testimony, tended to establish that plaintiff was not rude or uncooperative. On the contrary, the weight of the evidence shows that plaintiff was indeed rude and uncooperative over several years. Thus, the Court concludes that plaintiff has not shown that defendant's asserted reasons for the discharge were pretextual. It follows that plaintiff has not sustained a Title VII disparate treatment claim with respect to her discharge. In other words, the Court concludes that the discharge was not the result of gender based discrimination in violation of Title VII.

### B. Plaintiff's Elliott Larsen Act Sex Discrimination Claim

The Court next considers plaintiff's Elliott Larsen Act sex discrimination claim. In considering the Elliott Larsen disparate treatment standard, the Court has noted the theory that the Title VII disparate treatment analysis should be applied in Elliott Larsen disparate treatment cases.

This theory has rather ample support. First, the text of the Elliott Larsen disparate treatment statute reads very much like the text of the Title VII disparate treatment statute.[20] Because the Elliott Larsen Act was passed subsequent to the enactment of Title VII,[21] it is easy to infer that the Elliott Larsen disparate treatment statutory drafters probably sought to track the Title VII disparate treatment standard.

Next, the Court will point out—as it did in its *Moll* opinion[22]—that the Michigan Civil Rights Commission has issued interpretive regulations indicating that Title VII should be used as a guide in the interpretation of the Elliott Larsen Act. Because the Civil Rights Commission is the state's chief civil rights administrative agency, the Commission's guidelines are a fairly strong argument cutting in favor of applying the Title VII disparate treatment model to plaintiff's Elliott Larsen disparate treatment claim.

Finally, and most importantly, the Michigan judiciary seems inclined toward this interpretation of the Elliott Larsen Act. While Michigan Courts have not adopted wholesale the federal employment discrimination standards,[23] and while more will be said on this matter later in this opinion,[24] it remains that a good number of Michigan decisions resolve Elliott Larsen issues by reference to the legal standards codified in Title VII and the federal Age Discrimination Act.[25]

In light of this, the Court holds that the Elliott Larsen disparate treatment statutes, M.C.L.A. § 37.2202(1)(a) and (c) are to be construed in the same manner as the section 703(a)(1) Title VII disparate treatment statute. It follows that, for the rea-

---

**20.** *Cf.* M.C.L.A. § 37.2202(1)(a) with 2000e–2(a)(1).

**21.** Title VII was enacted on July 2, 1964 and became effective on July 2, 1965. *See* 2000e–15(a). The Elliott Larsen Act, P.A. 1976; No. 453, § 101, became effective on March 31, 1977.

**22.** *Moll v. Parkside Livonia Credit Union,* 525 F.Supp. 786 (ED Mich., 1981).

**23.** *See e.g., Civil Rights Dept. v. Sparrow,* 119 Mich.App. 387, 326 N.W.2d 519 (1982); *Northville Schools v. Civil Rights Commission,* 118 Mich.App. 573, 325 N.W.2d 497 (1982).

**24.** *See* nn. 56–60 and accompanying text *infra.*

**25.** This certainly appears to be the majority approach in Michigan at the present time. Several important Michigan Elliott Larsen decisions rely heavily on analogies and precedents drawn from the federal law of employment discrimination. *See e.g., Adama v. Doehler Jarvis,* 115 Mich.App. 82, 320 N.W.2d 298 (1982); *Gallaway v. Chrysler Corp.,* 105 Mich.App. 1, 306 N.W.2d 368 (1981); *Civil Rights Commission v. Taylor School District,* 96 Mich.App. 43, 292 N.W.2d 161 (1980); *Dept. of Civil Rights v. GMC,* 93 Mich.App. 366, 287 N.W.2d 240 (1979).

In this regard Judge Cohn has recently made the following remark:

"Michigan courts in interpreting Elliott Larsen regularly rely on federal court decisions, interpreting like provisions of Title VII. *Michigan Dept. of Civil Rights v. GMC,* 93 Mich.App. 366 [287 N.W.2d 240] (1979). Therefore, a violation of Title VII is a violation of Elliott Larsen."

sons stated in Part II–A of this opinion, plaintiff has failed to sustain her Elliott Larsen sex discrimination claim.

Similarly, the Court holds that the Elliott Larsen Act successorship issue is to be resolved in the same manner as the Title VII successorship issue. It is readily acknowledged that there is no successorship statute in either Title VII or the Elliott Larsen Act. Thus, there is no textual similarity to which the Court can point. Nevertheless, the Court believes that the Civil Rights Commission guidelines plus the Michigan decisions generally adopting the Title VII standards are enough—*absent some contrary indication by the Michigan lawmakers or the Michigan judiciary* —to justify applying the Title VII successorship doctrine to the Elliott Larsen Act. And thus, for the reasons stated in Part II–B of this opinion, the successorship doctrine is an alternative basis for denying plaintiff's pre-acquisition Elliott Larsen disparate treatment claim.

### C. *Plaintiff's Title VII Sex Harassment Claim*

The next theory asserted by plaintiff is that of sex harassment in violation of Title VII. Plaintiff contends that Mr. Henry's vulgar language and the displaying of sex oriented posters by Osceola male employees constituted unlawful sex harassment under Title VII.

Sex harassment is a relatively new Title VII concept. In the early years of Title VII, the courts, commentators and EEOC were far more concerned with such theories as disparate impact,[26] present effects of past discrimination[27] and the remedial scope of section 706(g).[28] Today, however, sex harassment is a controversial and extremely important Title VII issue.[29]

Conceptually, the sex harassment claim should be thought of as a species of disparate treatment rooted in section 703(a)(1). In this respect, it is noted that section 703(a)(1) provides as follows:

"It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin."

**26.** The leading disparate impact decision was, of course, *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Presaging *Griggs* was the most influential law review article in the history of Title VII, Cooper and Solol, *Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion,* 82 Harvard Law Rev. 1598 (1979). The classic post *Griggs* disparate impact article was Blumrosen, *Strangers in Paradise: Griggs v. Duke Power Co. and The Concept of Employment Discrimination,* 71 Michigan Law Rev. 59 (1972).

**27.** This theory was born at the district court level in *Quarles v. Philip Morris,* 279 F.Supp. 505 (ED Va., 1968), and was lauded in the scholarly community. *See e.g.,* Blumrosen, *Seniority and Equal Employment Opportunity: A Glimmer of Hope,* 23 Rutgers Law Rev. 268 (1969). The theory, however, was laid to rest by the Supreme Court in the famous case of *Teamsters v. U.S.,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

**28.** *See e.g., Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Franks v. Bowman Transportation Co.,* 424 U.S.

747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); Stacy, *Title VII Seniority Remedies in A Time of Economic Downturn,* 28 Vanderbilt Law Rev. 487 (1975).

**29.** Indeed, it may well be that sex harassment is *the* hottest present day Title VII issue. For just a sample of recent Title VII district court sex harassment opinions, *see Davis v. Western Southern Life Insurance Co.,* 34 FEP Cases 97 (ND Ohio, 1984); *Coley v. Conrail,* 34 FEP Cases 129 (ED Mich, 1982); *Fegh v. General Electric Co.,* 34 FEP Cases 135 (ED PA, 1983); *Schaffer v. National Can Co.,* 34 FEP Cases 172 (ED PA, 1983).

It also is interesting to note that sex harassment is becoming increasingly important in the arbitration forum. Of course, arbitration decisions have little or no weight in subsequent Title VII litigation. *See Alexander v. Gardner-Denver,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Nevertheless, the sex harassment arbitration decisions reflect that the sex harassment concept is now appearing in a wide variety of labor law settings. For recent sex harassment arbitration decisions, *see Dayton Power and Light Co.,* 80 LA 19 (1982); *Fisher Foods Inc.,* 80 LA 133 (1983).

■ The word "conditions" in section 703(a)(1) is crucial to the sex harassment concept. Where a female employee is subject to sex harassment, she is subject to a condition of employment that is invidiously discriminatory as opposed to the conditions of employment of male employees. *Because* she is a woman, the sexually harassed employee is made to suffer these conditions. Therefore, her rights under Title VII have been violated.

The Court believes it is quite important to establish that the sex harassment concept has moorings in the literal language of Title VII.[30] Unfortunately certain Title VII concepts—most notably the *Griggs* disparate impact theory[31]—have no real basis as far as statutory language goes.[32] Furthermore, a number of other Title VII concepts—most notably the *Weber*[33] voluntary affirmative action theory—seem to go directly *against*[34] the literal language of the subchapter.[35]

Sex harassment, however, is within the clear letter—and probably the spirit[36]—of Title VII. The judiciary simply cannot be accused of statutory policy making[37] with

**30.** The Sixth Circuit often has emphasized the importance of statutory language in ascertaining the intent of statutes. For the latest Sixth Circuit tuition on this subject, *see* pp. 10–14 of the March 22, 1984 slip opinion in *Patterson Trust v. US*, 729 F.2d 1089 (CA 6, 1984).

**31.** *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The disparate impact concept was strongly reaffirmed by the Supreme Court in *State of Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). After *Teal*, an individual component—such as a test—of a selection process can be challenged if the individual component produces a disparate impact even where the eventual selection rate does not reflect a disparate impact.

**32.** For a presentation of the contrary position, *see* the Cooper and Solol article cited at fn 31 *supra*. The authors attempt to show that the language of section 703(a)(2) of Title VII supports the disparate impact theory. *See* 82 Harvard Law Rev. 1608–1615 (1969). The effort, however, fails. Professor Boyd—a staunch advocate of disparate impact and an obvious liberal—frankly states:

> "The impact test itself was more a creature of judicial decision than congressional direction. Neither the statute nor the legislative history demand for a manifest relationship between an employment policy challenged and job performance."

Boyd, *Purpose and Effect in the Law of Race Discrimination: A Response to Washington v. Davis*, 57 U Det.J.Urban Law 706, 745 (1980).

**33.** *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), was the Supreme Court case holding that private employers may implement racial quota affirmative action plans without violating Title VII.

**34.** The literal language of section 703(a)(1) of Title VII proscribes all racial discrimination. Furthermore, the literal language of section 703(j) explicitly provides that Title VII does not require racial balancing. The conclusion is thus inescapable that *Weber* runs directly against the letter of Title VII.

The classic judicial criticism of *Weber* is Justice Rehnquist's *Weber* dissent. *See United Steelworkers v. Weber*, 443 U.S. 193, 218–254, 99 S.Ct. 2721, 2734–53, 61 L.Ed.2d 480 (Rehnquist J. dissenting). The most interesting academic criticism of *Weber* is Professor Meltzer's article. *See* Meltzer, *The Weber Case: The Judicial Abrogation of the Antidiscrimination Standard in Employment*, 47 U. Chicago Law Rev. 425 (1980).

**35.** *Weber* apparently resolves the Title VII racial quota issue. The constitutionality of racial quotas, however, may not be as clearly settled. For this Court's viewpoint on the constitution, racial quotas and the distinction between goals and quotas, *see Marsh v. Board of Education*, 581 F.Supp. 614 (1984).

**36.** This is so in spite of the curious genesis of the Title VII sex discrimination prohibition. This Court—like all Title VII enthusiasts—is well aware that the sex discrimination prohibition was added to Title VII as a joke by the notorious civil rights opponent Howard W. Smith. But the joke backfired on Smith when the amendment was adopted on the floor of the House under the House five-minute rule. *See* Vass, Title VII Legislative History, 7 B.C. Inc. & Com. Law Rev. 431, 441–42 (1966).

While sex discrimination thus was not even close to being a major concern of the original drafters of Title VII, it cannot be denied that sex discrimination was indeed very important to the 1972 and 1978 amendments to Title VII. *See e.g.*, the Pregnancy Discrimination Act of 1978 amending section 701(k) of Title VII to cover pregnancy discrimination. Therefore, it is entirely correct to conclude that Title VII—*as it now stands*—reflects a deep commitment to the eradication of gender based discrimination.

**37.** Federal statutory policy making is the bailiwick of the elected lawmakers rather than the

respect to the Title VII sex harassment claim.

In setting out the elements of Title VII sex harassment, it should be noted that the Sixth Circuit has yet to render a definitive sex harassment opinion. District courts within the Circuit[38] are, therefore, compelled to develop their own set of elements of the sex harassment claim.

■ One source of guidance is the EEOC sexual harassment guidelines. It should at once be pointed out, however, that the EEOC guidelines are *not* substantive administrative agency rules promulgated under authority of a statute.[39] Instead, the Commission's guidelines are but interpretative rules that courts are not at all bound to follow.[40]

Nevertheless, the Commission's sex harassment guidelines definitely are a useful starting point. The most important subsection in the guidelines is at 29 CFR § 1604.11(a). This subsection provides as follows:

"Harassment on the basis of sex is a violation of section 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or inexplicitly a term or condition of an individual's employment, (2) submission to a rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

The other relevant EEOC sex harassment guidelines with respect to the instant case are 29 CFR § 1604.11(d) and (f). 29 CFR § 1604.11(d) provides as follows:

"With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows

---

appointed federal judges. When a federal judge interprets a statute, his energies should be totally focused on the intent of the statute's drafters. John Hart Ely has opined that if a federal judge injects his own policy beliefs into statutory interpretation, people should

"conclude that he was not doing his job and might even consider a call to the lunacy commission."

Ely, *Democracy and Distrust: A Theory of Judicial Review.* The issue of federal court policy making is, of course, more complex when the constitution is to be interpreted. *See generally,* Ely, *id;* Grano, *Judicial Review and a Written Constitution,* 28 Wayne Law Rev. 1 (1981); Perry, *Non Interpretive Review in Human Rights Cases: A Functional Justification,* 56 NY U.Law Rev. 278 (1981).

**38.** Several judges sitting in the Eastern District of Michigan have written detailed sex harassment opinions. *See e.g., Coley v. Conrail,* 34 FEP 129 (ED Mich, 1982, opinion by former Judge Boyle); *Sand v. Johnson Co.,* 33 FEP Cases 716 (ED Mich, 1982, opinion by Judge Cohn); *Hill v. BASF Wyandotte Corp.,* 27 FEP Cases 66 (ED Mich, 1981, opinion by Judge Freeman).

**39.** In a famous discussion, the Supreme Court declared that the EEOC guidelines are merely interpretive—rather than substantive—regula-

tions. *Gilbert v. General Electric,* 429 U.S. 125, 140–145, 97 S.Ct. 401, 410–13, 50 L.Ed.2d 343 (1976). After *Gilbert,* it is entirely resolved that the Commission's guidelines are nothing more than an informed source of guidance that the judiciary may or may not follow.

**40.** *See id.* Perhaps the EEOC should study *Gilbert* a little harder. So many of the Commission's guidelines declare that various employment policies "are unlawful" or "shall be unlawful." *See e.g.,* 29 CFR § 1604.7; 29 CFR § 1604.9(f). But the Commission cannot dictate—it can only suggest. When this is kept in mind, the tenor of the EEOC guidelines seems most inappropriate.

The Court remembers a movement in the Congress that enacted Title VII directed toward conferring cease and desist remedial power on the EEOC. Under this proposal the Commission's remedial authority would have rivalled the remedial authority conferred on the National Labor Relations Board by section 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c).

This idea, however, was quashed by fears that the EEOC would be too high handed. *See generally,* Van, *Title VII Legislative History,* 7 B.C. Industrial and Commercial Law Rev. 432 (1966). The style and substance of the present day EEOC guidelines give the early warning about the EEOC a prophetic ring.

or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action."

29 CFR § 1604(f) provides as follows:

"Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under Title VII, and developing methods to sensitize all concerned."

A number of courts [41] have adopted the EEOC guidelines in sex harassment cases. With one important qualification, the guidelines seem to be reasonable and appropriate.

The qualification [42] that is necessary pertains to 29 CFR § 1604.11(a)(3). This subsection defines sexual harassment as conduct which

"has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating hostile or offensive work environment."

In the Court's viewpoint the word "unreasonably" opens the door to an important conceptual development of the sex harassment theory. This word entitles the judiciary to consider the nature of the employment environment in which the given plaintiff suffered the alleged harassment. This in turn authorizes courts to consider factors such as the educational background of the plaintiff's co-workers and supervisors, the physical make up of the plaintiff's work area, and the reasonable expectation of the plaintiff with respect to the kind of conduct that constitutes sex harassment.

Thus, under the approach sketched above, the standard for determining sex harassment would be different depending upon the work environment. Indeed, it cannot seriously be disputed that in some work environments, humor and language are rough hewn and vulgar. Sexual jokes, sexual conversations and girlie magazines may abound. Title VII was not meant to—or can—change this. It must never be forgotten that Title VII is the federal court mainstay in the struggle for equal employment opportunity for the female workers of America. But it is quite different to claim that Title VII was designed to bring about a magical transformation in the social mores of American workers. Clearly, the Court's qualification is necessary to enable 29 CFR § 1604.11(a)(3) to function as a workable judicial standard.

With this qualification stated, the Court will apply the Commission's sex harassment guidelines because: (1) the guidelines seem to express the intent of Title VII as to the disparate treatment sex harassment claim, and (2) several other federal courts—including appellate courts—have applied the guidelines.

In actually applying the guidelines to this case, the Court—like other courts [43]—will fit the guidelines into the general Title VII allocation of proof structure. Former Judge Boyle—in one of her last published opinions for the Eastern District of Michigan [44]—set out the elements of a sex harassment prima facie case as follows: (1) the plaintiff employee must belong to a protected group; (2) the employee must be subjected to invidious sex harassment; (3) the harassment complained

---

**41.** See e.g., Henson v. City of Dundee, 29 FEP Cases 787 (CA 11, 1982); Bundy v. Jackson, 641 F.2d 934 (DC Cir, 1981).

**42.** The "qualification" to which the Court refers merely is an interpretation of the word "unreasonably" as used in 29 CFR § 1604.11(a)(3). This Court believes that the reasonableness concept as used in the guideline invites judicial analysis.

**43.** See e.g., Henson v. City of Dundee, 29 FEP Cases 787 (CA 11, 1982); Davis v. Western Southern Life Insurance Co., 34 FEP Cases 97 (ND Ohio, 1984); Coley v. Conrail, 34 FEP Cases 129 (ED Mich, 1982); Hill v. BASF Wyandotte Co., 27 FEP Cases 66 (ED Mich, 1981).

**44.** See Coley v. Conrail, 34 FEP Cases 129 (ED Mich, 1982). Subsequent to Coley Judge Boyle accepted an appointment to the Michigan Supreme Court.

of was based on sex; (4) the harassment complained of affected a term, condition or privilege of employment; (5) respondeat superior liability exists.[45]

This statement of the sex harassment prima facie case, which has been applied by several courts,[46] is slightly redundant. Elements 1 and 3 are essentially the same. Once the concept of sex harassment is accepted, the need for element 4 vanishes for element 2 suffices. Nevertheless, it is helpful to go through the elements as applied by my learned colleague.

First, the Court notes that plaintiff belongs to a protected classification, women. Next, the Court finds that Mr. Henry's language and the posters were unwelcome. Third, for the reasons discussed above, the Court holds that the alleged acts of sex harassment were "because of sex." Fourth, for other reasons stated, the alleged sex harassment was a condition of plaintiff's employment. Fifth, the Court finds that defendant knew about Mr. Henry's language and the posters. Therefore, under well established sex harassment respondeat superior principles[47]—as well as under 29 CFR § 1604.11(d)—defendant employer can be held liable in this case.

In light of the above, the Court will hold that plaintiff has satisfied the sex harassment prima facie burden if plaintiff has carried the burden of proving that Mr. Henry's language combined with the posters constituted "sex harassment" as defined by the EEOC sex harassment guidelines as qualified by the court. Clearly, application of the qualified guidelines is the crucial point of the Title VII sex harassment offensive environment prima facie case. The guidelines must now be applied.

The immediately applicable guideline is 29 CFR § 1604.11(a). This guideline defines Title VII sex harassment. In the event that the Court concludes that plaintiff was the victim of section 1604.11(a) sex harassment, the Court will be required to conclude also that plaintiff satisfied the prima facie case.

In applying section 1604.11(a), the first issue posed is whether the combination of Mr. Henry's vulgarity and the sexual posters constituted "other verbal or physical conduct of a sexual nature."

Obviously, there was no physical conduct in this case. Thus, the Court need only decide whether the complained of conduct was "verbal conduct of a sexual nature." At once it must be recognized that a constitutional First Amendment issue is raised. This issue can be framed as follows: can Title VII prohibit people from verbally expressing themselves with language that is not "obscene" under the legal definition of the term? It will be seen that this issue need not be considered in this case. Nevertheless, it should be noted that this issue is raised by the present kind of case.

---

**45.** *See Coley v. Conrail,* 34 FEP Cases 129, 131 (ED Mich, 1982).

**46.** *See e.g., id. See also Henson v. City of Dundee,* 29 FEP Cases 787 (CA 11, 1982); *Hill v. BASF Wyandotte Corp.,* 27 FEP Cases 66 (ED Mich, 1981). The above two decisions preceded—and were cited in Judge Boyle's *Coley* opinion. Clearly, therefore, Judge Boyle did not create this version of the prima facie sex harassment test.

**47.** *See Henson v. City of Dundee,* 29 FEP Cases 787 (CA 11, 1982); *Bundy v. Jackson,* 641 F.2d 934 (DC Cir, 1981). These cases stand for the settled Title VII proposition that respondeat superior liability attaches where the employer *knew or should have known* of the discrimination or harassment.

This Court fervently hopes that this bright line respondeat superior rule continues to be the law under Title VII. The other federal court civil rights statutory giant—42 U.S.C. § 1983—is plagued by doctrinaire disputes over the concept of section 1983 respondeat superior liability.

In the Sixth Circuit, district courts currently are baffled by the cases of *Brandon v. Allen,* 719 F.2d 151 (CA 6, 1983) and *Bellamy v. Bradley,* 729 F.2d 416 (CA 6, 1984). *Brandon* and *Bellamy*—authored by different panels—set out entirely different respondeat superior section 1983 standards. Because the respondeat superior issue constantly arises in section 1983 litigation, the conflict between the two cases presents an extremely serious problem.

For an interesting theoretical discussion of the respondeat superior issue by one of the country's leading constitutional tort experts, *see* Nahmod, *Constitutional Accountability in Section 1983 Litigation,* 68 Iowa Law Rev. 1 (1982).

For now, however, the Court holds that Mr. Henry's language and the sexual posters fall within the span of the term "verbal conduct of a sexual nature." This term seems to be directed toward profane words and pictures that deal with sex. The evidence at trial clearly indicated that Mr. Henry's language and the posters were within the span of this term. Thus, the Court will now consider the section 1604.-11(a)(3) issue: whether the language and the posters had the "purpose or effect of unreasonably interfering with" plaintiff's work performance or whether the language and posters created an intimidating, hostile, or offensive working environment.

The first subissue that arises in this inquiry is whether the purpose of the language and posters was violative of subsection (3). The Court easily concludes that plaintiff proved no such purpose. The evidence at trial dealt with whether the language and posters really were present in plaintiff's work environment and the nature of the effect that the language and posters had on plaintiff and other female Osceola employees. Purpose simply was not dealt with and certainly was not proven.

Thus, it is necessary to move on to the effect issue: was the effect of Mr. Henry's language and the sexual posters such that it (1) unreasonably interfered with Ms. Rabidue's work performance, or (2) created an intimidating work environment, or (3) created a hostile work environment, or (4) created an offensive work environment? Each subissue raised by the general effect issue will now be addressed.

In this respect, first consideration will be given to the work performance subissue. Having reviewed the record carefully, the Court concludes that the vulgar language and sex oriented posters did not interfere with plaintiff's work performance. Plaintiff's work problems resulted from her temper and stubbornness. These personal traits are not connected with the language and posters.

Whether the language and posters created an intimidating environment is the next consideration. Again, the answer is in the negative. The Court believes that plaintiff was not at all fearful while employed at Osceola. The evidence simply does not reflect that plaintiff ever felt fear on the job.

The Court next considers whether the language and posters created a "hostile" work environment. In Judge Boyle's *Coley v. Conrail* opinion, it was stated that

"to state a claim under Title VII, sexual harassment must be (1) sufficiently persuasive so as to alter the conditions of employment and create an abusive working environment and (2) be sufficiently severe and persistent to affect seriously the psychological well being of employees." [48]

Judge Boyle apparently extracted this principle from the recent Eleventh Circuit case of *Henson v. City of Dundee*.[49] This Court agrees with the principle insofar as it relates to the "hostile" work environment prong of subsection 3. Applying the principle to the present case, the Court must hold that the combination of Mr. Henry's language and the posters did not make plaintiff's work environment "hostile."

The language and posters were not so drastic as to affect plaintiff's psychological well being. The evidence reflects that Mr. Henry's language was annoying, but not so shocking or severe as to actually affect the psyches of the female employees. Thus, the hostile work environment theory must be rejected.

Finally, the Court considers the final subsection 3 issue. This is the issue of whether the vulgar language and posters created an "offensive" environment.

The Court believes that the disjunctive in subsection 3 between the words "hostile" and "offensive" is significant. This evinc-

48. *See Coley v. Conrail,* 34 FEP Cases 129, 133 (ED Mich., 1982).

49. *See* 29 FEP Cases 787, 794–95 (CA 11, 1982).

es an EEOC intent to recognize sex harassment in circumstances milder than a "hostile" environment. The *Dundee* standard quoted earlier from Judge Boyle's *Coley* opinion clearly is directed toward the concept of a hostile work environment. The statement does not, however, seem to fit the concept of an "offensive" work environment. Therefore, this Court rejects the *Henson* statement as it applies to the offensive work environment prong of subsection 3.

■ Instead, the Court believes that an offensive work environment is created where, under an objective test, the complained of conduct is so significant a factor that the average female employee finds that her overall work experience is substantially and adversely affected by the conduct. Under this standard the sex harassment need not be psychologically disabling. On the other hand, trivial and merely annoying vulgarity would not constitute sex harassment.

■ The Court now applies this version of the "offensive work environment" standard to the present case. Clearly, this is the closest issue of the case. Nevertheless, the Court must again rule against plaintiff. In this respect it first is necessary to focus on Mr. Henry's vulgarity. While the vulgarity certainly was not commendable, it remains that the evidence did not go beyond showing that this one employee was vulgar. Furthermore after reviewing the evidence, plaintiff's overall work experience was not substantially affected by Mr. Henry's vulgarity. Instead, the vulgarity merely constituted an annoying—but fairly insignificant—part of the total job environment. Due to this Rule 52(a) finding, the Court must hold that the vulgarity did not cause plaintiff's working environment to be "offensive" under subsection 3.

Next, the Court considers the added effect of the posters. The Court believes that the posters had but a negligible effect in this case. No evidence was offered indicating that plaintiff has any especial sensitivity to erotic pictures. Furthermore, as the Court has mentioned, the subsection 3 standard pertains to the average female employee. In other words the test is an objective one.

For better or worse, modern America features open displays of written and pictorial erotica. Shopping centers, candy stores and prime time television regularly display pictures of naked bodies and erotic real or simulated sex acts. Living in this milieu, the average American should not be *legally* offended by sexually explicit posters.

The Court finds that the posters had a *de minimis* effect on plaintiff's work environment. The combined effect of the language and posters was almost identical to the effect of the vulgar language. Therefore, the Court concludes that Mr. Henry's vulgar language combined with the sexually explicit posters was not enough to make plaintiff's working environment offensive under 29 CFR § 1604.11(a)(3).[50]

It follows that plaintiff has failed to sustain the burden of proof that she suffered sex harassment. It likewise follows that plaintiff has failed to sustain her burden of establishing a sex harassment prima facie case, and the Court must hold that plaintiff is not entitled to relief under her Title VII sex harassment claim.

It should be noted, of course, that the successorship defense would have precluded pre-acquisition liability even if the Court's sex harassment ruling had not been in favor of defendant. It can be seen, however, that this sex harassment ruling renders the successorship theory an unneeded defense.

---

**50.** This Court is well aware that a sex harassment claim can be stated under subsections 1 and 2 of 29 CFR § 1604.11(a). These claims, however, were not asserted or even arguably raised by the proofs of *Rabidue*. Clearly, plaintiff's sex harassment claim could only be based on 29 CFR § 1604.11(a)(3). Therefore, there is no need to analyze subsections 1 and 2 in this opinion.

434

### D. Plaintiff's Elliott Larsen Sex Harassment Claim

Plaintiff next has asserted that she was the victim of sex harassment in violation of the Elliott Larsen Act. The reflex action would be to hold at once that a "no-cause" on the Elliott Larsen claim follows ineluctably from the Court's Title VII "no-cause" ruling. Careful reflection, however, shows that this approach would be most unsound.

Earlier in this opinion,[51] the Court indicated that the Elliott Larsen disparate treatment and successorship concepts track their Title VII counterparts. It must be pointed out, however, that state fair employment practices laws should not necessarily be identical to their federal counterparts. Indeed, the state fair employment practices laws may be inclined to grant more—or less—in the way of civil liberties protections[52] than the counterpart federal statutes.

Federal courts must thoroughly investigate whether such state laws are modeled on federal laws. Differences may well exist, and thus a set of facts litigated in one forum may result in different legal results in the other forum. This, of course, is the problem not dealt with by the Supreme Court in its *Kremer* decision[53] which held that federal courts are bound to apply res judicata after a discrimination claim has been resolved by state courts.[54] In any event this particular court will take great care before deciding that a state fair employment practices concept is the same as the federal concept.

Moving on to the sex harassment claim, it first is noted that—unlike Title VII—the Elliott Larsen Act explicitly deals with the sex harassment concept. In the definition section of the Elliott Larsen Act, it is provided that "Discrimination because of sex includes sexual harassment ..." The pertinent definitional subsection—M.C.L.A. § 37.2103(h)—then goes on to define the conduct constituting sex harassment. It thus is unnecessary to engage in verbal or theoretical exercises in order to tie the sex harassment concept to the literal language of the Elliott Larsen Act.

■ M.C.L.A. § 37.2303(h) is very similar to the EEOC sex harassment guidelines codified at 29 CFR § 1604.11(a). M.C.L.A. § 37.2103(h)(i) closely resembles 29 CFR § 1604.11(a)(1); M.C.L.A. § 37.2103(h)(ii) closely resembles 29 CFR § 1604.11(a)(2); and M.C.L.A. § 37.2103(h)(iii) closely resembles 29 CFR § 1604.11(a)(3). Subsections (h)(i) and (h)(ii) deal with submitting to sexual demands and thus are not relevant to the present case. The only relevant Elliott Larsen sex harassment subsection is M.C.L.A. § 37.2103(h)(iii). This subsection provides as follows:

---

**51.** *See* nn. 20–24 and accompanying text *supra*.

**52.** Because of the increasing conservatism of the federal bench, it appears likely that civil liberties will not be afforded less protection in state courts. Indeed, there are observers who believe that the state courts will assume the leading role in the field of civil liberties law. *See* Barbash, *State Courts Expanding Individuals' Rights*, p. 1, April 2, 1984 edition of the *Washington Post*.

The Court wonders about this theory. State judges lack the political insularity of their Article III federal court counterparts. This fundamental fact of state judicial life is enormously important—especially with respect to state trial judges in closely knit communities. Such judges must periodically ask society for re-election votes. It may be unrealistic to expect the same judges to enforce restraints on society in the name of protecting the civil liberties of the individual.

**53.** *See Kremer v. Chemical Construction Co.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

**54.** For a forceful criticism of *Kremer*, *see* Bartosic and Minda, *Labor Law Myth In the Supreme Court 1981 Term: A Plea For Realistic and Coherent Theory*, 30 UCLA Law Rev. 271, 290–294 (1982). *Kremer* is being applied all too vigorously. Two Circuits have held that *Kremer* mandates res judicata where an *employer* initiates state court judicial review. *See Gonsalves v. Alpine Country Club*, 33 FEP Cases 1817 (CA 1, 1984), *Davis v. US Steel Supply*, 29 FEP Cases 1202 (CA 3, 1982). This interpretation of *Kremer* operates to deprive the employment discrimination plaintiff of a federal court forum even where the plaintiff has not chosen to resort to the state courts. *See* Bartosic and Minda, *Labor Law Myth and the Supreme Court 1982 Term: A Plea For Realistic and Coherent Theory*, 30 UCLA Law Rev. 271, 293 (1982).

"Discrimination because of sex includes sex harassment which means unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct or communication of a sexual nature when such conduct or communication has the purpose or effect of substantially interfering with an individual's employment ... or creating an intimidating hostile or offensive employment ... environment."

Beyond question the text of the subsection was closely modelled on subsection (a)(3) of 29 CFR § 1604.11. The only real difference between the two provisions is that the EEOC guideline contains the term "unreasonably interfering" rather than the term "substantially interfering." Thus, in applying M.C.L.A. § 37.2103(h)(iii), the Court will utilize much of its earlier application of 29 CFR § 1604(a)(3) to plaintiff's Title VII sex harassment claim. It is, however, worth emphasizing that this analysis follows from the textual similarity noted above rather than a basic presumption that the Elliott Larsen Act must parallel Title VII.

Thus, for the reasons stated in the Title VII sex harassment section of this opinion,[55] it is concluded that the combination of Mr. Henry's vulgar language and the posters constituted "verbal conduct of a sexual nature." Similarly, for the reasons stated in the earlier part of this opinion,[56] the Court does not believe that the language and posters had the purpose or effect of creating an intimidating, hostile or offensive employment environment.

Thus, the sole remaining issue as to the Elliott Larsen Act sex harassment claim is whether the posters and vulgar language substantially interfered with plaintiff's work environment. As the Court has pointed out,[57] it does not believe that these two factors constituted substantial interference in plaintiff's work life. The posters and vulgar language were annoying, but they did not rise to the point of substantially interfering with plaintiff's job.

It follows that the Court must conclude that plaintiff has failed to sustain her claim of sex harassment under the Elliott Larsen Act.[58]

### E. *Plaintiff's Equal Pay Act Claim*

The final claim asserted by plaintiff is an Equal Pay Act claim. Plaintiff contends that she was not paid at a rate—including fringe benefits—equal to the rate received by male employees of defendant who performed substantially the same work as plaintiff.

29 U.S.C. § 206(d)(1), embedded in the Fair Labor Standards Act, is the operative provision of the Equal Pay Act. Under this statute a covered employer may not pay

"wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work or jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions ..."

Section 206(d)(1) then sets out a number of exceptions that are not applicable in this case.

As the Sixth Circuit has recently pointed out, an Equal Pay Act claimant has the prima facie case burden of proving that she performed equal work, but received less than equal pay.[59] With respect to the "equal work" issue, the Equal Pay Act claimant must show that her job is substantially equal to the better paying job occupied by a member of the opposite sex.[60]

---

**55.** *See* nn. 26–50 and accompanying text *supra.*

**56.** *See* nn. 46–50 and accompanying text *supra.*

**57.** *See id.*

**58.** It also should be noted that plaintiff's pre-acquisition sex harassment claim alternatively was foreclosed by the Court's successorship ruling.

**59.** *See Bence v. Detroit Health Corp.,* 712 F.2d 1024 (CA 6, 1983).

**60.** *See Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *Morgado v. Civil Defense Co.,* 32 FEP Cases 12 (CA 11, 1983); *EEPC v. Central Kansas Medical Center,* 31 FEP Cases 1510 (CA 10, 1983); *Hein v. Oregon College of Education,* 33 FEP Cases 1538

■ The Court finds and concludes that plaintiff has failed to meet even the prima facie case under section 206(d)(1). Plaintiff failed to bring forth evidence showing that males occupied a substantially equal job to plaintiff's job, but received greater pay. Plaintiff did attempt to bring forth proof of isolated fringe benefits received by male employees, but plaintiff simply never showed that substantially equal jobs to plaintiff's various jobs were remunerated at a greater rate, including fringe benefits. Absent the two-pronged showing of (1) substantially equal work and (2) unequal pay, there can be no Equal Pay Act claim. Indeed, absent these two elements, there can be no prima facie Equal Pay Act case.

In view of the above the Court concludes that plaintiff has failed to sustain her Equal Pay Act claim. It is noted that the successorship issue as an alternative basis for rejecting plaintiff's pre-acquisition Equal Pay Act claim was not explored. In this respect it must be recognized that as part of the Fair Labor Standards Act—rather that Title VII—the Equal Pay Act successorship doctrine is not necessarily identical to the Title VII successorship doctrine. In any event, this issue was not considered because it was so clear that plaintiff failed to even come close to meeting the Equal Pay Act prima facie case.

## IV CONCLUSION AND ORDER

For the reasons stated in the foregoing opinion, the Court finds and concludes that plaintiff Rabidue has failed to sustain any of the claims which she has asserted. Therefore, the Clerk of the Court is to enter a judgment indicating that defendant has prevailed in this case and plaintiff takes nothing.

IT IS SO ORDERED.

(CA 9, 1983); *EEOC v. Mercy Hospital,* 32 FEP Cases 991 (CA 7, 1983); *EEOC v. American Pharmaceutical Assoc.,* 33 FEP Cases 924 (DC RI, 1983); *Winkes v. Brown University,* 32 FEP Cases 1041 (1983); *Serpe v. Four Phase System,* 33 FEP Cases 169 (ND California, 1982).