**Lori L. BAAB, Plaintiff,**

v.

**AMR SERVICES CORPORATION, Defendant.**

**No. 5:91 CV 2574.**

United States District Court, N.D. Ohio, E.D.

Jan. 6, 1993.

1248

Robert J. Ohlweiler, Canton, OH, for plaintiff.

Carolyn K. Seymour, Robert M. Wolff, Duvin, Cahn & Barnard, Cleveland, OH, for defendant.

## ORDER

SAM H. BELL, District Judge.

### I. INTRODUCTION

Currently before the court is defendant's motion for summary judgment, Docket # 26. Final briefing on this matter was completed on the 2nd of November, 1992, rendering the defendant's motion ripe for adjudication.

The circumstances which culminated in this litigation may be briefly stated as follows. Plaintiff was an employee of the defendant, a servicer of airlines. Plaintiff omitted and/or misrepresented some facts on her employment application. Unaware of plaintiff's misstatements, the employer hired her as a ramp serviceperson (baggage handler and aircraft cleaner). Thereafter, plaintiff suffered injuries precluding uninterrupted job performance; she also suffered from epileptic seizures. After being examined by a company physician, plaintiff was prohibited from returning to her position as a ramp serviceperson. Plaintiff presently remains on the defendants records as an employee on an unpaid leave of absence. Greater factual detail, where necessary, is provided below.

Plaintiff, a citizen of Ohio, filed her complaint in an Ohio state court in November of 1991. That complaint, brought against three out-of-state corporate defendants, was promptly removed by the defendants on the basis of diversity jurisdiction. Since that time, the defendants moved for, and were granted dismissal of the portion of plaintiff's case. On the 27th of July, 1992, this court entered an order which concluded:

> Defendants AMR Corporation and American Airlines are hereby dismissed as parties to this cause. Further, the third count of the complaint is dismissed in its entirety for failure to state a claim upon which relief can be granted.

(Order Granting Defendants' Motion to Dismiss, Docket # 17). Hence, plaintiff is left with a redacted complaint, which raises three state law [1] claims, to wit: construc-

---

1. In this court's 12(b)(6) opinion, the undersigned stated:

> The complaint contains four separate counts, each alleging a cause of action under Ohio law

> . . . . .

> In actuality, plaintiff's claim for sexual harassment and wrongful discharge (counts one and four) do not cite to any relevant state or federal law as the basis for relief and so

could be considered being premised upon either. However, defendants removed the action to this court on the basis of diversity of citizenship, characterizing all of plaintiff's claims as seeking relief solely under state law. Plaintiff has not challenged this characterization of her claims, and so the court will proceed on this basis. Thus, the merits of the within motion will be entertained with a view towards the law of Ohio, which this court is to apply in diversity actions.

tive discharge for sexual harassment, (count one), intentional infliction of emotional distress (count two) and discriminatory discharge based upon plaintiff's handicapped status, epilepsy (count four).[2] Defendant has moved for summary judgment on all counts. In so doing, the defendant raises novel issues of law which, unfortunately, has both required some degree of deliberation and accounts for the length of the following opinion.

## II. STANDARD OF REVIEW

■ In reviewing a motion for summary judgment, a court must consider the pleadings, related documents, evidence, and all reasonable inferences in a manner most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60 (6th Cir.1979). Rule 56 provides, in relevant part, as follows:

(c) . . .

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

. . . . .

(e) . . .

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

■ Three Supreme Court cases have provided guidance as to the nature of the respective burdens allocated under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The ultimate burden lies with the non-moving

(Order Granting Defendants' Motion to Dismiss, Docket #17 at 1 and footnote 1). Since that time, and in the instant motion, both parties have maintained the same posture, namely that this case is controlled by Ohio law. Indeed, since this court's prior dismissal order, plaintiff has moved for leave to amend her complaint "to bring it under the jurisdiction of the Federal Court via Title 7, 42 U.S.C. Sec. 2000 *et seq.;* and the Rehabilitation Act of 1973, 29 U.S.C. Sec. 701 *et seq. . . .*" (Plaintiff's motion for leave to file her first amended complaint, Docket #27, at 2) That motion and another for leave to file a second amended complaint, filed after the deadline for dispositive motions and after defendant's submission of its original motion for summary judgment and shortly before trial, were denied as unduly prejudicial to the defendant. (Docket #39) (citing *Davis v. Therm-O-Disc, Inc.,* 791 F.Supp. 693 (N.D.Ohio 1992) (Bell, J.)). Accordingly, this court should and in good conscience must continue its application of Ohio law.

2. Atypically, plaintiff's complaint does not contain specific reference to the legal theory (or statute) providing grounds for relief. Although count two does contain the words "intentional infliction of emotional distress," this court's construction of counts one and four derives from the language used in those counts, logic, and the parties' interpretation of them. With

regard to count four, the purported legal basis for relief seems apparent. (Complaint, ¶29 "[d]espite said doctor's report Defendants unlawfully discriminated against Lori L. Baab by dismissing her from her position because she has this handicap [epilepsy].") With regard to count one, our initial conclusion is more attenuated. There, plaintiff alleges instances of workplace sexually degrading conduct, including receipt of pornographic pictures in her locker. Plaintiff claims that these activities created "a hostile work environment for Plaintiff." (Complaint, ¶15) This count concludes with the statement that:

As a direct and proximate cause of the above-described acts, omissions and/or unlawful conduct of defendants, Plaintiff, Lori Baab, has been terminated from her employment. . . .

(Complaint, ¶19) Presumably, then, plaintiff claims that sexual harassment resulted in a constructive discharge. *See, e.g., Scandanavian Health Spa v. Ohio Civil Rights Commission,* 64 Ohio App.3d 480, 581 N.E.2d 1169 (1990). Plaintiff's counsel apparently agrees with this conclusion. (Plaintiff's Brief in Opposition to the Defendant's Motion for Summary Judgment, Docket #38 at 10) (Plaintiff has alleged in her Complaint that her termination was motivated by sexual harassment. . . .) Accordingly, the claims before the court are defined.

party to show the existence of a genuine issue of material fact. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.' Fed.Rule Civ.Proc. 56(e)." *Matsushita*, 475 U.S. at 586–587, 106 S.Ct. at 1356 (emphasis supplied). "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The court in *Anderson* held that "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff had had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514.

■ On the other hand, the moving party's burden under Rule 56 is lighter.

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c) ... suggests the absence of such a requirement.

*Celotex, supra,* at 323, 106 S.Ct. at 2553 (emphasis supplied).

The Sixth Circuit Court of Appeals, in *Street v. J.C. Bradford and Co.,* 886 F.2d 1472 (6th Cir.1989) recently reviewed court decisions and commentary regarding the impact of *Anderson, Celotex,* and *Matsushita* on summary judgment practice. The court concluded that a "new era" in summary judgment practice has opened in the court system as a result of these opinions.

Scholars and courts are in agreement that a "new era" in summary judgments dawned by virtue of the Court's opinions in these cases ... On the whole, these decisions reflect a salutary return to the original purpose of summary judgments. Over the years, decisions requiring denial of summary judgment if there was even a suggestion of an issue of fact had tended to emasculate summary judgment as an effective procedural device.

*Street, supra,* at 1476.

The court enunciated the following "new era" principles, among others: as on federal directed verdict motions, the "scintilla" rule applies, *i.e.,* the respondent must adduce more than a scintilla of evidence to overcome the motion; the respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment"; the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact. *Id.* at 1479–1480 (footnotes and citations omitted).

With these standards in mind, the court shall address the defendant's motion.

## III. LAW AND ANALYSIS

### A. The After–Acquired Evidence Doctrine

■ The defendant's first contention is that the summary judgment is appropriate on all remaining counts on the basis of what has come to be called the after-acquired evidence doctrine. *See e.g., Summers v. State Farm Mutual Auto Ins. Co.,* 864 F.2d 700 (10th Cir.1988). This concept arises when an employee has engaged in misconduct, either prior to employment or

during her employment, and then brings a claim for discriminatory discharge. At its most basic level, this doctrine holds that if "[an employer] can prove that, had it known of its employee's misconduct, it would have terminated [his or] her employment," the plaintiff employee may not recover on her civil rights claim. *McKennon v. Nashville Banner Pub. Co.*, 797 F.Supp. 604, 608 (M.D.Tenn.1992). Although both defendant and relevant courts have proclaimed that this doctrine has been "adopted by the Sixth Circuit", its adoption of this standard is not, standing alone, conclusive for the purposes of this case. *Id.* Although it is clear that the after-acquired evidence doctrine governs federal claims of discrimination, *see Paglio v. Chagrin Valley Hunt Club Corp.*, 1992 WL 144674, 1992 U.S.App. LEXIS 15399 (6th Cir.1992), in the case at bar we deal with discriminatory discharge claims premised upon Ohio law. Thus, Ohio's actual or prospective adoption of this doctrine is our initial concern.

### i. Application of the After–Acquired Evidence Doctrine in Ohio

In deciding a question of state law, this court is, of course, bound by the determination of the state's highest court. To this court's knowledge, the Ohio Supreme Court has not addressed the after-acquired evidence doctrine. Where a state's highest court has not spoken on a precise issue, "a federal court may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir.1989). This rule applies regardless of whether the appellate court decision is published or unpublished. *Id. See also Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1140 (6th Cir.1986). This court's detailed search of Ohio case law leads it to conclude that at least one Ohio appellate court has apparently applied the after-acquired evidence doctrine, albeit without use of that nomenclature and has done so in an unpublished opinion. *See Wilson v. Hupp Co.*, No. 5417, slip op., 1987 WL 20474 (8th App.Dist. Nov. 15, 1987).

In *Wilson*, the Cuyahoga County Court of Appeals engaged in a *de novo* review of the trial court's grant of the defendant's motion for summary judgment. In that case, the plaintiff brought a retaliatory discharge claim under Ohio Revised Code § 4123.90, the statute protecting employees from discharge for applying for worker's compensation benefits. The Plaintiff applied for benefits and was subsequently discharged. The employer defended the discharge by noting that in his application for benefits, it was revealed that the plaintiff/employee had lied on his employment application form, by omitting a previous employer and injury received and that there was no genuine issue that this conduct was grounds for termination. The appellate court, in a per curiam opinion issued by Judges Matia, Dyke and Markus, concluded that even though the plaintiff had established a prima facie case for retaliatory discharge, the employer was entitled to judgment as a matter of law. Although their analysis was couched in the terms of the employer's rebuttal of the employee's prima facie case, the court concluded:

> In light of appellant's admission that he deliberately falsified his employment application, *it would be impossible for him to show that his discharge was a mere pretext and that the real reason for the discharge was intentional discrimination on an unlawful basis. The trial court correctly concluded that there existed no genuine issue for trial and that appellee was entitled to judgment as a matter of law.*

*Wilson v. Hupp Co.*, No. 54176, slip op. at 3, 1987 WL 20474 (8th App.Dist. Nov. 25, 1987) (per curiam). This opinion clearly suggests that Ohio appellate courts have, or at least would likely, apply the after-acquired evidence doctrine. *Cf. Paglio v. Chagrin Valley Hunt Club Corp.*, 1992 WL 144674 at *2, 1992 U.S.App. LEXIS 15399 at *2 ("even if the Club was motivated to discharge Paglio because of his age, the misuse of Club funds discovered after Paglio's retirement provided an indepen-

dent basis for termination. Inasmuch as the misuse of Club funds is factually uncontroverted, there exists no genuine issue of material fact and the moving party (the Club) is entitled to judgment as a matter of law.") However, even if Ohio appellate courts have not spoken on this issue, it seems clear that the Ohio Supreme Court would likely apply the doctrine.

It has been held that "[w]here no state supreme court precedent is applicable, 'in predicting how a state's highest court would rule, federal courts must follow intermediate state court decisions, policies underlying the applicable legal principles, and the doctrinal trends indicated by these policies.'" *Janikowski v. Bendix Corp.*, 823 F.2d 945, 948 (6th Cir.1987). As a general principle of law, "an employer may defend a wrongful discharge claim on the basis of facts unknown at the time of discharge and, therefore, not an actual or inducing motive for the termination." *Johnson v. Honeywell Information Systems, Inc.*, 955 F.2d 409, 412 (6th Cir.1992) (citing 56 C.J.S. *Master and Servant* § 51; 53 Am.Jur.2d, *Master and Servant* § 46; *Leahey v. Federal Express Corp.*, 685 F.Supp. 127, 128 (E.D.Va.1988)). The after-acquired evidence doctrine is gaining increasing acceptance among state courts. *See, e.g., Johnson v. Honeywell Information Systems, Inc.*, 955 F.2d 409 (6th Cir. 1992) (Michigan law); *O'Driscoll v. Hercules, Inc.*, 745 F.Supp. 656 (D.Utah 1990) (Utah law). In courts applying federal law, the trend is clearly in favor of its application. *See, e.g., Paglio v. Chagrin Valley Hunt Club Corp.*, 1992 WL 144674 1992 U.S.App. LEXIS 15399 (6th Cir.1992) (ADEA and, perhaps, Ohio Rev.Code § 4112.02); *Summers v. State Farm Mutual Automobile Insurance Co.*, 864 F.2d 700 (10th Cir.1988); *Washington v. Lake County, Illinois*, 969 F.2d 250 (7th Cir. 1992) (Title VII); *Churchman v. Pinkerton's Inc.*, 756 F.Supp. 515 (D.Kan.1991) (Title VII); *McKennon v. Nashville Banner Pub. Co.*, 797 F.Supp. 604 (M.D.Tenn. 1992) (ADEA); *Dotson v. U.S. Postal Service*, 794 F.Supp. 654 (E.D.Mich.1991), *aff'd without opinion*, 961 F.2d 1576 (Table) (6th Cir.1992) (discrimination upon the basis of handicap under the Rehabilitation Act of 1973). While the trend in state law is, of course, highly relevant, for our purposes the trend in federal law is equally germane.

In this state, cases of discrimination brought under Ohio statutes prohibiting such conduct are interpreted in accordance with the standards applicable under federal discrimination laws. *Little Forest Medical Center of Akron v. Ohio Civil Rights Commission*, 61 Ohio St.3d 607, 609–10, 575 N.E.2d 1164 (1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1263, 117 L.Ed.2d 491 (1992). ("[F]ederal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) [2000e] *et. seq.*, Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112."); *Scandanavian Health Spa v. Ohio Civil Rights Commission*, 64 Ohio App.3d 480, 489, 581 N.E.2d 1169 (1990) (sexual harassment case under Ohio Rev.Code § 4112 wherein the court "adopt[ed] the criteria articulated by the Sixth Circuit under Title VII"). *See also Ohio ex rel. Republic Steel Corp. v. Ohio Civil Rights Commission*, 44 Ohio St.2d 178, 339 N.E.2d 658 (1975); *Weiner v. Cuyahoga Community College District*, 19 Ohio St.2d 35, 249 N.E.2d 907 (1969), *cert. denied*, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1969).

In light of Ohio's general endorsement of the federal courts' interpretation of anti-discrimination laws, the Ohio Supreme Court's decision to apply the after-acquired evidence doctrine to its own anti-bias statutes, itself far from revolutionary, seems a logical conclusion. Accordingly, this court holds that the Ohio Supreme Court would employ the after-acquired evidence doctrine in state discrimination claims and, therefore, this court shall do the same.

B. Application of the After–Acquired Evidence Doctrine to this Case

With the applicability of this doctrine established, it must be determined whether this doctrine would bar plaintiff's discrimi-

nation claims. As noted by the defendant, the after-acquired evidence doctrine may be divided into two categories depending upon the nature of the misconduct engaged in by the employer.

The first category of cases may roughly be described as "would have hired" cases and essentially involve "resume fraud". In such a case, the employee falsifies his or her employment application or resume. If this falsification is later discovered, "summary judgment is appropriate where the misrepresentation or omission was material, directly related to measuring a candidate for employment, and was relied upon by the employer in making the hiring decision." *Johnson v. Honeywell Informations Systems, Inc.*, 955 F.2d at 415. In other words, the question is whether the plaintiff/employee would have been hired had he or she truthfully filled out his application or resume. *See e.g., Washington v. Lake County, Ill.*, 969 F.2d 250, 254 (7th Cir.1992) (cited with approval in *Milligan–Jensen v. Michigan Tech. Univ.*, 975 F.2d 302, 305 n. 3 (6th Cir.1992)). ("The first hypothetical question is whether the [employer] would have hired [the plaintiff/employee] if it had known [the truth]."); *Churchman v. Pinkerton's Inc.*, 756 F.Supp. 515, 521 (D.Kan.1991) (cited with approval in *Johnson*, 955 F.2d at 414) ("plaintiff would not have been hired if she had truthfully completed the employment application....")

The second category is often characterized as "would have fired" cases and most often arises when an employee, post-hire, engages in misconduct, although resume fraud cases may also be analyzed under the "would have fired" standard. *See Milligan–Jensen v. Michigan Technological Univ.*, 975 F.2d 302 (6th Cir.1992). If there is no genuine issue that the employee would have been fired had the misconduct been known, summary judgment in favor of the defendant/employer is appropriate. *Paglio v. Chagrin Valley Hunt Club Corp.*, 1992 WL 144674 at *2, 1992 U.S.App. LEXIS 15399 at *2.

The defendant in the instant case argues that the plaintiffs' claims are precluded under both theories. There is persuasive, albeit non-binding, authority which holds that the after-acquired evidence doctrine may only be used to ask whether the employer would have made the *same decision challenged in the case before the court (refusal to hire or discharge)*, had it known of the after-acquired evidence. *Washington v. Lake County, Ill.*, 969 F.2d 250 (7th Cir.1992); *see infra* note 5. Under that authority, our inquiry here, in light of plaintiff's claims of discriminatory discharge, would be limited to determining whether the defendant "would have fired" plaintiff had it known of the after-acquired evidence. Our Circuit has not yet provided guidance concerning the Seventh Circuit's proposition. In light of this fact, and the fact that the conclusion reached below does no violence to the Seventh Circuit's compelling holding, this court shall apply both the "would not have hired" and the "would have fired" standards.

i. The Falsified Application and the "would not have hired" Standard

In the case at bar, it is indisputable that plaintiff omitted information on her employment application. (*See* Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, Docket #38 at 7) ("Plaintiff Lori Baab's misrepresentations on her employment application....") Plaintiff applied for baggage handler/ramp serviceperson position with the defendant on January 23, 1989. (Baab. Depo at 12). Her employment application states, immediately above the signature line:

I understand that falsification of this information in connection with employment *will be grounds for immediate termination regardless of when such falsification is discovered*

(Baab Depo. Exhibit 1 at 7) As part of the application process, Plaintiff also filled out a medical questionnaire. (Baab Depo. Exhibit 1 at 3) Directly above the signature line, this document states:

FALSIFICATION or MISREPRESENTATION of this application will be grounds for dismissal.

(*Id.*) (emphasis in original) Plaintiff was aware of this condition at the time she filled out the application. (Baab Depo. at 13) The medical questionnaire contained the following questions, among others:

HAVE YOU EVER (HAD) OR HAVE YOU NOW:

. . . . .

...

| | YES | NO | |
|---|---|---|---|
| | [ ] | [ ] | leg trouble |
| | [ ] | [ ] | bone or joint trouble |
| | [ ] | [ ] | limited motion of any joint |

...

| | [ ] | [ ] | other hospitalization |

(*Id.*) (emphasis in original) Plaintiff answered "no" to each of these questions. (*Id.*) Despite her answer in the negative, plaintiff at deposition admitted that she had suffered a knee injury, for which surgery was recommended and had been hospitalized after being hit by a car while riding a bicycle. (Baab Depo. at 7–10, 14–17) In fact, plaintiff's refusal to have surgery on her knee resulted in her discharge from the military. (*Id.* at 7) The records of Ms. Baab's own treating physician reveal that plaintiff received treatment for injury to her right knee on January 5, 1989—less than three weeks before she filled out her employment application:

"Says went into shock" ...

. . . . .

No injury except knee—
Right knee—twisted and felt "pop" out—air cast on and popped back in Sub lexed patella

(Defendant's Exhibit E–2 at 1).

In addition to her health-related misstatements, plaintiff also misstated her employment history. In two places on her application, plaintiff represented that she had been in the U.S. Air Force for two years in the position of dental assistant-medical evac and had left service at the rank of E–3. (Baab Depo. Exhibit 1 at 6) In actuality, plaintiff was in the Air Force for ten months, gained only a rank of E–2 and her discharge records make no mention of "medical evac" duties. (Defendant's Exhibit E–1) With this factual background established, we are now called upon to determine whether the afore-mentioned mis-

representations were "material, directly related to measuring a candidate for employment, and was relied upon by the employer in making the hiring decision." *Johnson*, 955 F.2d at 414.

Plaintiff's job description accurately reflects what her job duties were as a ramp-serviceperson (baggage handler) for the defendant. (Baab Depo. at 24) This description reads as follows:

The work of the Ramp Serviceman classification, depending upon assignment and qualifications, includes any or all of the following: loading and unloading baggage and cargo compartments of airplanes of any type, perform all exterior or interior aircraft cleaning, provisioning any and all aircraft with cabin service supplies, may work at airfreight docks receiving, dispatching, and staging airfreight, air mail, and other cargo; may be required to clean the exterior of aircraft with specialized cleaning fluids; may be assigned to fuel and oil aircraft, drain oil pumps and perform other fuel farm activities; de-icing aircraft; pushing out/towing of aircraft, and related guide man functions; may be assigned to perform routine cleaning of work areas, ramps, and facilities with or without powered equipment, may be assigned to do routine automotive repair; servicing and cleaning of powered and unpowered equipment.

(Baab Depo. Exhibit 2) When asked what part of the job duties required bending and lifting, plaintiff responded: "[m]ostly all of it, especially the bags, luggage." (Baab Depo. at 25) To prove the materiality of her misstatements, defendant offers the following passage from the affidavit of plaintiff's supervisor, Thomas Bucka:

In Lori Baab's situation, her failure to truthfully disclose her prior history of substantial knee problems on the AMR application's "Have Your Ever (Had) or Have You Now" would have resulted in her discharge from AMR if we had known of it prior to this lawsuit. The position Ms. Baab applied for, ramp serviceman, is extremely physically demanding. It requires extensive lifting and

bending, requires the employee to be on her feet for a considerable length of time and to operate several motor vehicles. AMR needed to know whether Lori Baab could perform the position she applied for, with or without accommodation, in order to ensure her safety and that of her co-workers and the travelling public. The only way AMR could make an informed judgment on this issue was for Ms. Baab to provide true and accurate answers on the employment application, which she did not. Thus, Ms. Baab's misrepresentations were serious enough that she would have been terminated had AMR known of them prior to this lawsuit.

(Bucka Aff., Defendant's Exhibit D at ¶ 9) This evidence, while compelling, is insufficient for the court to conclude that plaintiff would not have been *hired* had she been forthcoming with the truth on her employment application. The proof offered by the defendant makes no claim that the truth would disqualify plaintiff from employment. Rather, it speaks only in terms of her termination. As noted by the Seventh Circuit:

> [t]he distinction between a "would not have hired" standard and a "would have fired" standard can be important.... [Because], an employer might be less willing to fire an employee if the misrepresentation is discovered after the employee has started the job and has proven himself to be capable.

*Washington v. Lake County, Ill.,* 969 F.2d 250, 254 (7th Cir.1992). With no proof directed toward the hiring decision, AMR is not entitled to summary judgment on the basis of a "would not have hired" category of the after-acquired evidence doctrine. This conclusion, however, does not end our inquiry. It is clear that the same misconduct, here the so called "resume fraud", may act as a bar to relief under either the "would not have hired" or "would have fired" categories of the after-acquired evidence doctrine. *See Johnson v. Honeywell Information Systems, Inc.,* 955 F.2d 409, 415 (6th Cir.1992). ("Because [defendant] established that it would not have hired Johnson *and* that it would have fired her

had it become aware of her resume fraud during her employment, [plaintiff] is entitled to no relief....") (emphasis added); *see also Churchman v. Pinkerton's Inc.,* 756 F.Supp. 515, 521 (D.Kan.1991) (so holding). The court now turns to the question of whether plaintiff Baab would have been fired had her misconduct been known to her employer.

ii. The "would have fired" Standard

■ As noted above, it is incontrovertible that plaintiff falsified her employment application in response to two inquiries. It is also unrebutted that plaintiff would have been terminated had the employer known of these misrepresentations. (Bucka Aff. at ¶¶ 8, 9) It is equally clear that plaintiff engaged in post-hire workplace misconduct. In the early Summer of 1991, plaintiff, suffering finger numbness and eye spasms, told her employer that her doctor had recommended a test which she wished to have done at the Veterans Administration clinic to save money. (Baab Depo. at 75–79) Her supervisor granted her time off to do so on two occasions. Plaintiff went to the VA on two separate occasions, waited about an hour and then left. (Baab Depo. at 81) Plaintiff did not tell her supervisor that she did not see a doctor. (Baab Depo. at 93) The records of plaintiff's own physician plainly state in the July 29, 1991 entry, "Lori told her boss she went to the VA and didn't." (Defendant's Exhibit E–2 at 8) As noted in the uncontroverted affidavit of plaintiff's supervisor: "[l]ying to a supervisor to secure time off and then not using the allotted time for the reason stated is an extremely serious offense warranting immediate discharge." (Bucka Aff. at ¶ 11). As the affiant concludes: "had I known that Lori Baab had lied to me on two consecutive days and had never seen a doctor despite being given time off for that specific, I would have discharged her." (*Id.*) Thus, there is no genuine issue that plaintiff would have been terminated had her misconduct been known.

Plaintiff attempts to circumvent this conclusion by providing factual context for her wrongdoing. As for her misrepresentation

of her medical history, plaintiff states that she believed "the questions regarding my medical condition pertained to my condition [at the time of application]." (Baab Aff. at ¶ 3) Plaintiff makes this claim despite the fact the application inquires, in capitalized letters, whether the applicant "HAD" or now has the conditions described. (Baab Depo. Exhibit 1 at 3) With regard to her military service misrepresentation, plaintiff proffers that they were the result not having "any documentation to refer to." (*Id.* at ¶ 5) A most cursory examination of this contention compels this court to agree with the defendant's assertion that "[i]t stretches credulity to believe that Lori Baab or anyone else would mistakenly believe they served two years in the Armed Forces when they were discharged after ten months." (Defendant's Reply Brief, Docket # 40 at 4) Finally, she explains her medical leave prevarication was simply the result of the V.A. Clinic's overcrowding and long-wait. (*Id.* at ¶ 18) The fact remains that she did mislead her supervisor and, regardless of the cause of that deception, plaintiff nowhere rebuts the defendant's proof that plaintiff's deception would have resulted in immediate termination.

Plaintiff also points to three other facts in an attempt to create a genuine issue that she would not have been discharged. First, plaintiff argues that the fact that plaintiff remains, to this day, on AMR records as an employee on an unpaid leave of absence rebuts the defendant's contention that plaintiff would have been immediately terminated had her application and employment misconduct been discovered prior to this suit. (Bucka Aff. at ¶ 5) This court cannot accept plaintiff's contention. In a "would have fired" case, our inquiry is directed to determining if the employer, had it known of the employee's misconduct, would have discharged the plaintiff immediately. *O'Day v. McDonnell Douglas Helicopter Co.*, 784 F.Supp.

1466, 1468 (D.Ariz.1992). Indeed, the after-acquired evidence doctrine, as its name suggests, utilizes facts discovered after the commencement of legal proceedings to answer a question which the plaintiff/employee's deception prevented from being asked, to wit: would this person have been terminated for his or her misconduct. An employer's clerical ministration of the plaintiff/employee's personnel file after the commencement of the legal proceedings which brought plaintiff's deception to light is wholly immaterial to that determination.[3] This conclusion dovetails with the second point advanced by plaintiff, namely that the defendant's act of offering plaintiff another position after she had been prevented, by order of the company doctor, from continuing her original position is "incongruous" with the defendant's contention that it would have fired plaintiff had it known of her deceit. (*See* Plaintiff's Brief in Opposition to the Defendant's Motion for Summary Judgment, Docket # 38 at 9) Contrary to plaintiff's assertion, the fact of another job offer, made *before* plaintiff's deceit was known, does not rebut the defendant's contention that her deceit would have resulted in discharge.

Plaintiff's final and most compelling argument asserts that the fact that she suffered a post-hire knee injury, resulting in a months-long absence from work, and was not consequently discharged raises the inference that the condition of her knee was not a material consideration in the defendant's hiring/firing decision. (Plaintiff's Brief in Opposition to the Defendant's Motion for Summary Judgment, Docket # 38 at 8) But under either a "would not have hired" or a "would have fired" analysis involving resume fraud, we are first concerned with the materiality of the *question* itself. Namely, we must be offered proof that the matter inquired upon in the application or represented in the resume was "directly related to measuring

---

3. It should be noted here that plaintiff's argument in this regard raises a question involving the consistency of this argument and her statement of claim. Plaintiff's Complaint at ¶ 19 states: "As a direct and proximate cause of the above-described acts, omissions and/or unlawful conduct of defendants, Plaintiff, Lori Baab, has been terminated from her employment...."

the candidate for employment and was relied upon by the employer" *Johnson*, 955 F.2d at 414. ("Since the evidence is that the [employer] relied upon the misrepresentations, they were material.") The defendant in the case at bar has presented unrebutted proof that the matter inquired upon was material to its *hiring* decision. (*See* Bucka Aff. at ¶ 9):

> The position Ms. Baab applied for, ramp serviceman, is extremely physically demanding. It requires extensive lifting and bending, requires the employee to be on her feet for considerable length of time and to operate several motor vehicles. AMR needed to know whether Lori Baab could perform the position she applied for, with or without accommodation, in order to ensure her safety and that of her co-workers and the traveling public. The only way AMR could make an informed judgment on this issue was for Ms. Baab to provide true and accurate answers on the employment application.

The plaintiff has presented no proof that her physical condition is not a material consideration for employment as a baggage handler. In either a "would not have hired" or "would have fired" case involving resume fraud, the materiality requirement (that the matter be relied upon and directly related to candidate evaluation) remains the same. Simply put, proof that an employer did not fire an injured worker is not tantamount to proof that an injury revealed on an application is not considered an important factor in the hiring decision. Thus, we must conclude that the question, and her answer were material. In so doing, it is noted that the establishment of materiality will often be a matter of common logic, easily supportable by affidavit. This is especially true when the resume fraud concerns an omission, where an employer deals entirely in the hypothetical realm of what it might have done. For instance, while the condition of one's knees may be quite material to a baggage handler, football player, or policeman on foot-patrol, that same condition would likely be, as a matter of law and/or simple proof, inconsequential for a book editor or accountant. Thus, in most cases, materiality may be easily established although it may be rebutted by the testimony of employment experts or proof of hiring practices in fact. Essentially, the most common point of contention will thus be the *effect* of the material misrepresentation. Simply because one misrepresented a material fact does not, ipso facto, constitute proof that that person would have been fired for that misrepresentation. For instance, a football player may well be hired in spite of his knee impairment. In that same vein, however, a foot-patrol policeman may be hired regardless of that injury but would be fired if his failure to apprise his employer of that injury came to light. Thus, we now turn to proof of the hypothetical effect of plaintiff's misrepresentations and the proof necessary to overcome summary judgment on that proof.

█ Once the materiality of the application question or resume representation is established, we must turn to proof that the defendant would have *fired* plaintiff had the truth been known *or* had the falsification become known, two separate inquiries. An employer may properly invoke the after-acquired evidence doctrine in a "would have fired" context by proof of two facts, together or in the alternative. First, the defendant may establish that it would have fired the plaintiff had evidence of the truth (but not the falsehood itself) come to light during employment. For instance, the defendant here could offer proof that it would have fired the plaintiff when she became injured. Second, it may establish that it would have terminated the plaintiff because of the falsehood, the employee misconduct, itself. In the case at bar, the defendant could offer proof that the plaintiff's lie, in its own right, would cause immediate termination. This analysis is borne out in Sixth Circuit case law.

In *Milligan–Jensen v. Michigan Technological Univ.*, 975 F.2d 302 (6th Cir.1992), the defendant discovered, after commencement of the Title VII case, that the plaintiff had omitted a drunk driving conviction from her employment application. Before the after-acquired evidence doctrine was the law of this Circuit, the trial judge

found that the employer would have dismissed the plaintiff had it known of the falsification, but nevertheless found in favor of the plaintiff. 767 F.Supp. 1403, 1410 (W.D.Mich.1991). In so doing, the court found as a matter of fact that "mere conviction on the driving offense would *not* have resulted in termination. Rather, it was the *falsification* of the application that was the critical factor." 975 F.2d 302, 303 n. 1. On the basis of these facts, the Sixth Circuit reversed the district court and remanded with instruction to enter judgment for the defendant. *Id.* at 304. Thus, it seems clear that falsification, standing alone, may provide grounds for the application of the after-acquired evidence doctrine. *See Id.* at note 2 ("it is immaterial whether the appellee would have been terminated for the falsification itself or the underlying misrepresentation.") In other words, that the truth (but not the falsehood) did not lead to dismissal may be immaterial based upon the argument advanced by the defendant.

■ Here we must remember that every falsehood has two components, the prevarication itself and the underlying fact misrepresented or omitted. Either compo-

nent could give cause for immediate termination. *See Milligan–Jensen*, at 304 note 2 ("it is immaterial whether the [plaintiff] would have been terminated for the falsification itself or the underlying misrepresentation."). The plaintiff herein has offered proof that the underlying fact omitted, her knee injury, did not give cause for termination by offering proof that the injury, once it was disclosed, did not result in her termination.[4] Thus, summary judgment on this basis alone is not appropriate. This, however, does not conclude our inquiry.

■ In the instant case, the defendant has offered proof that the prevarication alone was cause for dismissal. (*See* Bucka Aff. at ¶ 9) ("[the] misrepresentations were serious enough that she would have been terminated had AMR known of them prior to this lawsuit."); (Baab Depo. Exhibit 1 at 7) ("falsification ... will be grounds for immediate termination....") In order to rebut this type of proof, plaintiff should present evidence that similar misstatements or omissions resulted in no action on the part of the employer or in some type of discipline or demotion rather than discharge.[5] Because a defendant em-

4. In a "would not have hired case", a plaintiff could rebut defendant's argument as to the materiality of underlying misrepresentation by proof that a similar condition actually disclosed on an application or resume did not prevent another person from being hired by the defendant. For instance, misrepresented academic performance could be rebutted by proof that the defendant had hired, or would hire, persons with credentials similar or inferior to the plaintiff's. Consequently, if the defendant here argued that it would not have hired the plaintiff, the plaintiff could offer proof that the defendant had hired others with similarly debilitating injuries, relevant to job performance abilities, whether to the knee or not.

5. Because this is no longer a "would not have hired case", this court need not address whether the fact of prevarication alone is sufficient to invoke the after-acquired evidence doctrine in that circumstance. The troubling aspect of this doctrine is that it can very well lead to penalty-free discrimination by an employer. In a "would not have hired case", it seems apparent that any (and likely all) employers could easily prove that they would not have hired a plaintiff they knew was lying on their application or resume, regardless of the magnitude of that lie. In effect, a prevaricating plaintiff may well be

completely barred from pursuing a discriminatory failure-to-hire case. It is perhaps for this reason that the opinions of which this court is aware have limited their inquiry in "would not have hired cases" to determining whether the plaintiff would have been hired had he or she truthfully completed his application or resume. *See, e.g., Washington,* 969 F.2d at 254; *Churchman,* 756 F.Supp. at 521.

If one invokes that same reasoning in a "would have fired" case, it acquires a more sinister tone. An argument that one would not hire an applicant that falsifies a material matter is, as noted above, self-evident. That conclusion (that one would not have hired a liar), however, would provide discriminatory employers with an irrefutable defense to all discrimination claims. It is perhaps due to this reasoning that the Seventh Circuit limits inquiry under the after-acquired evidence doctrine to asking whether the employer would have made the *same decision challenged in the case before the court (refusal to hire or discharge),* had it known of the after-acquired evidence. *Washington v. Lake County, Ill.,* 969 F.2d at 255 (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–245, 109 S.Ct. 1775, 1787–1788, 104 L.Ed.2d 268 (1989)). As noted by Judge Cummings:

There is some equitable appeal for the conclusion that someone who would not have been

ployer may, by self-serving affidavit, quite easily establish that the prevarication is grounds for dismissal, it is this court's opinion that the proof offered by the plaintiff should not be limited solely to proof of other applicants' or employees' "resume fraud", but may encompass other instances of material falsehood which, when discovered by the employer, did not result in termination. The plaintiff, however, has come forward with no evidence of such instances, thus compelling this court to conclude that the falsification of this material item was grounds for, and would have resulted in immediate termination. The fact of plaintiff's application falsification, when combined with her misconduct while employed (for which plaintiff offers no excuse or rebuttal) obliges this court to conclude that there is no genuine issue of material fact and that defendant is entitled to summary judgment as a matter of law.

■ It is important now that this court establish the perimeters of its judgment. It is clear that the plaintiff's discriminatory discharge claims (counts one and four) are barred by virtue of the after-acquired evidence doctrine. *See, e.g., Johnson v. Honeywell Information Systems, Inc.*, 955 F.2d 409, 412 (6th Cir.1992); *O'Driscoll v. Hercules, Inc.*, 745 F.Supp. 656 (D.Utah 1990); *Paglio v. Chagrin Valley Hunt Club Corp.*, 1992 WL 144674, 1992 U.S.App. LEXIS 15399 (6th Cir.1992);

hired but for his own fraudulent conduct should not receive any relief from employment discrimination laws for a later employment decision. While this assertion may have some merit if the employment decision challenged is a refusal to hire, it is otherwise ultimately misguided. In the Supreme Court mixed motive cases, the temporal focus is on the time of the adverse employment decision, and the inquiry is whether the same employment decision would have been made if the protected characteristic or conduct were removed from consideration. There is no reason why this approach should not be used in *Summers*-type cases.

Focusing on whether the applicant would have been hired is an unjustified importation of "property rights" concepts into employment discrimination law.

. . . . .

a "property right" in one's job, … is not a requirement for showing injury in a federal discrimination claim. Title VII, which pro-

*Summers v. State Farm Mutual Automobile Insurance Co.*, 864 F.2d 700 (10th Cir. 1988); *Washington v. Lake County, Illinois*, 969 F.2d 250 (7th Cir.1992); *Churchman v. Pinkerton's Inc.*, 756 F.Supp. 515 (D.Kan.1991); *McKennon v. Nashville Banner Pub. Co.*, 797 F.Supp. 604 (M.D.Tenn.1992); *Dotson v. U.S. Postal Service*, 794 F.Supp. 654 (E.D.Mich.1991). Nevertheless, the defendant here advances the argument that "recovery on all claims is precluded pursuant to the after-acquired evidence rule." (Defendant AMR Services Corporation's Brief in Reply to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, Docket # 40 at 2) Consequently, AMR argues that the plaintiff's claim of intentional infliction of emotion distress is also barred by the after-acquired evidence doctrine. On this point, the court is not persuaded.

■ The after-acquired evidence doctrine stands for the proposition that the injury complained of, (in this case discharge), would have and should have occurred despite the discrimination which allegedly occurred. Thus:

[when] falsification of the employment application, if discovered during her employment, would have resulted in [plaintiff's] termination, *it becomes irrelevant whether or not she was discriminated against.*

scribes discrimination in employment, nowhere mentions the need for a property right. Indeed, it could not be a requirement, since much employment in this country is "at-will", where the employee can be fired for any reason or no reason. There is no "at-will" defense to a federal discrimination complaint. Rather, the inquiry in a discrimination case is whether the plaintiff has been treated differently than similarly situated employees because of forbidden grounds. To summarize, the appropriate issue in an employment discrimination case where the plaintiff lied on his application and was later fired for an unrelated reason is whether the employer, acting in a race-neutral fashion, would have fired the employee upon discovery of the misrepresentation, not whether the employer would have hired the employee had it known the truth.

969 F.2d at 256. It is this court's opinion that this reasoning is persuasive and should be the law governing this case.

*Milligan–Jensen,* 975 F.2d at 305. This is true because "plaintiff suffered no legal damage by being fired." *Id. See also Summers v. State Farm Mutual Auto Ins. Co.,* 864 F.2d 700, 708 (10th Cir.1988). ("[A]fter-acquired evidence ... is relevant to [plaintiff's] claim of 'injury', and does itself preclude the grant of an present relief.") As noted above, the after-acquired evidence doctrine at its most basic level precludes recovery if the injury complained of would have occurred if the after-acquired evidence had been known. Applying this paradigm to the intentional tort at issue here would result in the following reasoning: that the emotional distress would have been inflicted earlier if the defendant had known plaintiff engaged in resume fraud and misconduct during employment. Under this model, plaintiff is injured nonetheless and that injury was neither caused nor justified by conduct attributable to her. Similarly, one could take the view that plaintiff should not complain of injury inflicted upon her at her workplace when, had the defendant been apprised of her wrongdoing, she would not have been there in the first place. This argument also misses the mark. The injury complained of here is injury to one's person and plaintiff is entitled to be free of that injury regardless of her status as a dischargeable employee. *See Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 570 N.E.2d 1076 (1991). In this court's view, the after-acquired evidence doctrine does not bar plaintiff's claim of intentional infliction of emotional distress.

C. Intentional Infliction of Emotional Distress

 The facts alleged to be the underpinnings for plaintiff's emotional distress claim are enumerated in paragraphs 9 through 18 of her complaint. These paragraphs state:

9. Commencing in or about mid-January of 1991 Plaintiff, Lori Baab, began receiving sexually explicit pornographic pictures in her personal locker at her job.

10. Plaintiff, Lori Baab, reported this occurrence to her Supervisor, Thomas Bucka, who suggested that she put a lock on her employee locker.

11. Plaintiff, Lori Baab, placed a lock as advised on her locker only to continue to receive the offensive pictures in her locker through the airvents.

12. Plaintiff again informed her Supervisor, Thomas Bucka, who made no further suggestions to assist plaintiff in this matter.

13. In a further attempt to stop the above mentioned activity, Plaintiff placed tape on the inside of the airvents of her locker which tape was cut through by the perpetrator and/or perpetrators of the offensive behavior.

14. Plaintiff, Lori Baab, continued to receive the unwanted sexually explicit and pornographic pictures in her locker throughout the remainder of her employment with Defendant, AMR Corporation.

15. Plaintiff's co-workers also displayed sexually explicit and pornographic pictures·on walls and bulletin boards in the common areas available to the employees thereby creating a hostile work environment for Plaintiff.

16. Plaintiff repeatedly requested of her Supervisors, both Thomas Bucka and Marty Bierman, that something be done to stop these occurrences. Neither of these individuals took any action to aid Plaintiff in this regard.

17. The offensive acts described herein occurred on a continuous and regular basis until on or about July 24, 1991 when Plaintiff, Lori Baab's active employment with AMR Corporation was discontinued.

18. As a direct and proximate result of the aforementioned acts, omissions and/or unlawful conduct of defendants, and each of them, Plaintiff, Lori Baab, sustained injuries described as post traumatic stress disorder, extreme anguish, nervousness, anxiety, depression, headaches, sleeplessness and pain and suffering. Said injuries may be permanent in nature.

(Complaint at ¶¶ 9–18) Plaintiff, referring to these allegations, states her claim as follows:

By virtue of the acts, omissions and/or unlawful acts of the Defendants previously set forth herein, Defendants intentionally inflicted emotional distress upon Plaintiff Lori L. Baab.

(Complaint at ¶ 21) As determined at plaintiff's deposition, in February 1991, pictures began appearing on the walls of the break room which showed the "swimsuit edition of *Sports Illustrated,* Julia Roberts ... Madonna, [and] things like that." (Baab Depo. at 124). The pictures showed women who were "clothed [and were] nothing you couldn't buy at the check-out counter." (*Id.*) Although plaintiff never made a complaint to her supervisors about this matter, plaintiff's supervisor nevertheless removed these photographs. (Baab Depo. at 127) Following removal of those pictures, male co-workers (presumably) put up pictures of naked women, "not doing any sexual acts," under maps and other items hanging on walls in the workplace. (*Id.* at 128) Plaintiff admits that she never complained to her supervisors about the pictures that "were on the wall, the ones under the map or other pictures." (*Id.* at 128, 142)[6] Plaintiff first complained to her supervisor when she began receiving lewd materials in her employee locker. (Baab Depo. at 128) Among the items which plaintiff received were a bottle of sexual lubricant and explicit pictures. Another, employee, a male, also received "joke" materials in his locker, although they were not sex-related. (Baab Depo. at 149) To this day, plaintiff has "no idea" who put things in her locker. (Baab Depo. at 150).

In her affidavit contra the instant motion, plaintiff states:

[a]lthough I continually complained, my supervisors laughed it off, Thomas Bucka stating, "Boys will be boys."

(Baab Aff. at ¶ 15) Nevertheless, plaintiff's deposition establishes that her supervisors did take action. Plaintiff admits that neither of her supervisors sexually harassed her. (Baab Depo. at 118, 121 (Q: "[D]id [he] ever deal with you in any way that you thought was ... sexually harassing?", A: "No."; Q: "Did [he] treat you fairly?", A: "Yes.")) After her first complaint to a supervisor, plaintiff was told that he (the supervisor) "would have a talk with the guys." (Baab Depo. at 153) Upon her second complaint, her supervisor suggested she put a lock on her locker. (*Id.*) Plaintiff continued to receive items. (*Id.*) After another complaint, plaintiff's supervisor went over to Randy's area, got a roll of tape, handed it to [plaintiff] and told [her] "Why don't we tape up your vents?" (Baab Depo. at 154) Plaintiff continued to receive pictures and, at the suggestion of another supervisor, put cardboard over the vent to no avail. (Baab Depo. at 156). In addition to her supervisor's lock, tape and cardboard actions, one supervisor threatened employees on all shifts with "immediate dismissal" for "going into anyone else's locker...." (Bucka Depo. at 87) (Messenheimer Depo. at 18) ("He says if you get caught, it's immediate dismissal, and he told us that quite a few times.") At the time these acts were occurring, AMR Services had a written, posted policy on sexual harassment. (Messenheimer Depo. at 28) (Bucka Aff. at ¶ 7 and Attachments 2 and 3 thereto). Plaintiff admits that she never looked at the AMR official policybook to ascertain Company policy regarding sexual harassment. (Baab Depo. at 177–78).

---

**6.** Although plaintiff repeatedly stated in her deposition that she did not complain to her supervisors, in her affidavit submitted in opposition to the defendant's motion, she states:

I showed Tom Bucka the pictures hidden under the map and he only laughed and did nothing to remove them.

(Baab Aff. at ¶ 10) This, apparently, creates a conflict between plaintiff's deposition and affidavit. It is well settled that "a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been

made, which contradicts his earlier deposition testimony." *Gagne v. Northwestern National Ins. Co.,* 881 F.2d 309, 315 (6th Cir.1989). If the event plaintiff relates had occurred, it surely would have come to light during plaintiff's deposition. Plaintiff's counsel, however, has not directed this court to testimony on this matter. On summary judgment, the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989).

On summary judgment, the defendant attacks the sufficiency of plaintiff's intentional infliction of emotional distress claim on two grounds. First, defendant argues that there is insufficient proof to support any legal theory that it, the employer, may be held liable for the acts of its employee. Second, the defendant claims that the plaintiff's proof, even if accepted as true, does not exhibit the characteristics of conduct supporting such a claim as a matter of law (*See* Defendant AMR Services Corporation's Reply Brief at 9) ("[w]e invite this Court to accept Plaintiff's factual averments as true for purposes of this Motion.") The court shall address defendant's arguments *seriatim.*

### i. Employer Liability for the tort of Plaintiff's Co-Workers

 The plaintiff herein attempts to hold her employer responsible for the tort of a co-worker. In so doing, Ohio has traditionally held that the employer may be liable only if the offending co-worker's acts are attributable to the employer under the doctrine of *respondeat superior. See, e.g., Miller v. Reed,* 27 Ohio App.3d 70, 499 N.E.2d 919 (1986); *Hester v. Church's Fried Chicken,* 27 Ohio App.3d 74, 499 N.E.2d 923 (1986). Ohio law provides that "[i]t is well-established that in order for an employer to be liable under the doctrine of respondeat superior, the tort of the employee must be committed within the scope of employment. Moreover, where the tort is intentional, ... the behavior giving rise to the tort must be 'calculated to facilitate or promote the business for which the servant was employed....' " *Osborne v. Lyles,* 63 Ohio St.3d 326, 329, 587 N.E.2d 825 (1992) (quoting *Byrd v. Faber,* 57 Ohio St.3d 56, 58, 565 N.E.2d 584, 587 (1991)). In general, "an intentional and wilful (sic) attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from his employment and his principal or employer is not responsible therefor...." *Id.* (quoting *Vrabel v. Acri* 156 Ohio St. 467, 474, 103 N.E.2d 564, 568 (1952)). Due to the intentional nature of the tort alleged here, the defendant contends that the acts of the offending co-worker were undoubtedly out-

side his scope of employment and thus, no *respondeat superior* liability may attach. The court completely agrees with the defendant. As one court recently noted:

> [t]here is no presumption that the wrongful act of the agent was the act of the principal; authority to do the act must be demonstrated, or ratification of the act by the principal shown. Where the tort consists of a wilful and malicious act, as here, it is not generally considered to be within the scope of employment.

*Miller v. Reed,* 27 Ohio App.3d at 72, 499 N.E.2d at 921. The plaintiff's tort claim here is premised upon the putative sexual harassment of the plaintiff. This harassment consisted, in the main, of unwanted display of nude photographs and the unwanted receipt of sexually suggestive objects in her locker. In the first instance, the court must note that plaintiff has offered no proof establishing who performed any of the acts complained of. Both plaintiff and defendant repeatedly refer to unidentified harassers. The court, for the purpose of analysis only, presumes that the harassers were employees of the defendant. Nevertheless, it is clear that defendant herein had a written, posted policy forbidding "the display, in the workplace, of sexually suggestive objects or pictures such as nude photographs." (Bucka Aff. at ¶ 7 and attachment 2 and 3 thereto) It is likewise indisputable that plaintiff's supervisors *removed* pictures of which they were aware and threatened with termination anyone tampering with plaintiff's locker. Thus, although simple logic dictates that inflicting emotional distress upon plaintiff is outside the scope of plaintiff's co-workers' employment and could not possibly promote the business (moving luggage) for which they were employed, it is indisputable that the series of discreet acts giving rise to this claim were forbidden and jeopardized the employment of those engaging in such conduct. Consequently, there in no question that the offending co-workers' acts were outside the scope of their baggage handling duties and were not ratified by the employer. As such, *respondeat superior* liability may not attach.

The conclusion reached as a result of the analysis followed above does not square with the present doctrinal law in Ohio. The Ohio Supreme Court has recently changed the view of employer's tort liability from previously enunciated vicarious liability principles known to the common law. At this point and on this issue then we must presently digress.

In *Kerans v. Porter Paint Co.*, 61 Ohio St.3d 486, 575 N.E.2d 428 (1991), the plaintiff was employed as a decorator for the defendant at one of its suburban Cincinnati stores. While employed by the defendant, plaintiff was subjected to gross sexual harassment and molestation by the manager of the store where she worked. In response to these incidents, the plaintiff (and her husband) brought a five count complaint against the defendant employer, claiming 1) intentional or negligent maintenance of a policy encouraging or condoning sexual harassment, 2) assault and battery, 3) negligent or intentional infliction of emotional distress, 4) negligent or intentional failure to provide a safe workplace, and 5) loss of consortium. The trial court granted the defendant's motion for summary judgment on all counts on the grounds that Ohio's worker's compensation statute provided an exclusive remedy. The Court of Appeals affirmed judgment on that basis.

On appeal, the defendant/appellee argued that:

even if [plaintiff]/appellants' claims are not barred by R.C. 4123.74 [worker's compensation], [defendant]/appellee cannot be held liable for its employee's intentional acts since the activities which form the basis of the complaint took place outside the scope of the perpetrator's employment. [Defendant]/Appellee contends that because it did not hire [the store manager] to sexually harass female employees, and because [the store manager's] actions in no way facilitated appellee's business, it may not be held liable for the harm which resulted from his egregious behavior.

61 Ohio St.3d at 490, 575 N.E.2d 428. Thus, the defendant in *Kerans* maintained the same posture as that taken by the defendant in the case at bar, to wit: the co-worker's acts were wholly removed from the scope of his employment and thus it may not be liable under the doctrine of *respondeat superior*.

The Ohio Supreme Court, reversing the appellate panel, first held that the worker's compensation statute did not provide the exclusive remedy for plaintiffs' injury. The court then addressed the defendant/appellee's *respondeat superior* argument. The Court first noted that there existed a genuine issue of material fact whether the store manager was a supervisor of the plaintiff and his actions could thus have taken place within the scope of his employment. *See Kerans*, 61 Ohio St.3d at 490, 575 N.E.2d 428 ("where an employee is able to sexually harass another employee because of the authority or apparent authority vested in him by the employer, it may be said that the harasser's actions took place within the scope of his employment.") The Court majority, however, did not end its analysis at this point. It continued:

Even if [the store manager's] activites took place outside the scope of his employment, summary judgment against appellants' claims would not be proper.

61 Ohio St.3d at 491, 575 N.E.2d 428. Citing the Restatement on Torts dealing with employer negligence in failing to control its employees [7], the Court stated:

(ii) is using a chattel of the master, and
(b) the master
(i) knows or has reason to know that he has the ability to control his servant, and
(ii) knows or should know of the necessity and opportunity for exercising such control

RESTATEMENT (SECOND) OF TORTS § 317 (1965).

---

7. The Restatement provides:
A master is under a duty to exercise reasonable care so as to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
(a) the servant
(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

we hold that where a plaintiff brings a claim against an employer predicated upon allegations of workplace sexual harassment by a company employee, and where there is evidence in the record suggesting that the employee has a past history of sexually harassing behavior about which the employer knew or should have known, summary judgment may not be granted in favor of the employer, even where the employee's actions in no way further or promote the employer's business. An employer has a duty to provide its employees with a safe work environment and, thus, may be independently liable for failing to take corrective action against an employee who poses a threat of harm to fellow employees, even where the employee's actions do not serve or advance the employer's business goals. Whether the employer has acted appropriately in a particular situation is a factual matter to be determined on a case by case basis. However, where an employer knows or has reason to know that one of his employees is sexually harassing other employees, he may not sit idly by and do nothing. The appropriate response, which may range in severity from a verbal warning, to transfer, to a temporary suspension, to a firing, will depend on the facts of the particular case, including the frequency and severity of the employee's actions.

*Kerans*, 61 Ohio St.3d at 492–93, 575 N.E.2d 428. The Court noted that there was evidence that the employer knew of its manager's similar misconduct in the past and apparently took no action. *Id.* at 493–94, 575 N.E.2d 428. The Court concluded:

Consequently, we hold that the trial court erred in granting summary judgment on appellants' second [assault and battery], third [negligent and intentional infliction of emotional distress], fourth [failure to provide plaintiff with a safe work environment] and fifth claims [loss of consortium] for relief.

*Kerans*, 61 Ohio St.3d at 494, 575 N.E.2d 428.

■■■ Discerning the meaning of this holding poses some difficulties.[8] In their curt dissent, the minority viewed the Court's holding as one creating a new tort of sexual harassment. *Kerans*, 61 Ohio St.3d at 496, 575 N.E.2d 428. ("I cannot join the majority in its creation of a new tort against an employer which has no foundation in common law.") Although that view could be taken, it seems that a court intending to obtain such a goal would do so with clarity. In both the syllabus and the majority opinion, Justice Robie Resnick spoke not of a sexual harassment claim, but of "a claim against the employer predicated upon allegations of workplace sexual harassment." *Kerans*, 61 Ohio St.3d at 492–93, 575 N.E.2d 428. Rather than propounding a new tort and its elements, the Court in *Kerans* instead appears to have advanced a new legal basis for employer liability for existing torts. A contextual reading of the opinion can only lead to the conclusion that the Court intended its reading of Section 317 of the RESTATEMENT to establish liability for existing tort claims advanced by plaintiffs which are "predicated upon allegations of workplace sexual harassment." *Id.* This is true because although the Court did hold

---

**8.** Our analysis is further complicated by the rule that Ohio courts must follow the principles set forth in the syllabi of Ohio Supreme Court opinions; the syllabi, not the body of the opinion states the law of the case. *Smith v. Klem*, 6 Ohio St.3d 16, 450 N.E.2d 1171 (1983). In practice, however, Ohio courts routinely disregard this rule. Indeed, the rule is not stated in the syllabus of the case cited cited by the *Klem* Court to support this proposition, but is rather found in the body of the opinion. *See DeLozier v. Sommer*, 38 Ohio St.2d 268, 271, 313 N.E.2d 386 (1974). Nevertheless, it is worth mentioning that the *Kerans* syllabus is also of little assistance here:

Where a plaintiff brings a claim against an employer predicated upon allegations of workplace sexual harassment by a company employee, and where there is evidence in the record suggesting that the employee has a past history of sexually harassing behavior about which the employer knew or should have known, summary judgment may not be granted in favor of the employer, even where the employee's actions in no way further or promote the employer's business.

*Kerans v. Porter Paint Co.*, 61 Ohio St.3d 486, 487, 575 N.E.2d 428 (1991).

that there was a genuine issue of fact regarding the employer's liability under *respondeat superior*, it held that "even if [the employee's] activities took place outside the scope of his employment, summary judgment against appellants' *claims* would not be proper" *Kerans*, 61 Ohio St.3d at 491, 575 N.E.2d 428 (emphasis added). After its Section 317 analysis and *in the same paragraph*, the Court concluded: *"[c]onsequently*, we hold that the trial court erred in granting summary judgment on appellants' second, third, fourth and fifth claims for relief." *Kerans*, 61 Ohio St.3d at 494, 575 N.E.2d 428 (emphasis added). Had the Court intended to create an entirely new tort, it need not have enumerated which counts of the plaintiffs' complaint survived, and it surely would not have revived several divergent counts. Similarly, had the Court merely intended to adopt Section 317 as the law of Ohio, it need only have revived the fourth count, negligent or intentional failure to provide plaintiff with a safe workplace. Consequently, this court must conclude that in Ohio, the Supreme Court's reading of Section 317 of the RESTATEMENT establishes liability for all tort claims advanced by plaintiffs which are "predicated upon allegations of workplace sexual harassment." *Kerans*, 61 Ohio St.3d at 492–493, 575 N.E.2d 428.

At this point, it must be noted that the *Kerans* case is at odds with the precepts of the common law. Whether this be so or not so in the mind of this court, it is not relevant. The opinion of this court on the question posed in the request for summary judgment is one which is governed by the law of Ohio as stated by the Supreme Court of that state.

In this court's view *Kerans*, rather than holding the employer liable for its own negligence, uses that negligence to establish vicarious liability for all torts of the employee predicated upon sexual harassment. Thus, the plaintiff must prove the negligence of the employer and then, apparently, the torts of the the the harassing employee. In effect, the *Kerans* Court held that the torts of co-workers predicated upon sexual harassment are within the scope of employment if the employer was

negligent in not preventing that malfeasance.

Assuming the interpretation above to be a correct one, we must determine, in the first instance, whether the employer in the instant case, AMR Services, was negligent as that term is defined in *Kerans*. In so doing, we must determine whether there:

> is evidence in the record suggesting that the [harassing] employee has a past history of sexually harassing behavior about which the employer knew or should have known....

*Kerans*, 61 Ohio St.3d at 493, 575 N.E.2d 428. If this is the case, the employer "may be independently liable for failing to take corrective action against an employee who poses a threat of harm to fellow employees...." *Id.* In the case at bar, as we have noted, the record is completely barren of any evidence establishing the fundamental factual prerequisite of the employer's negligence. As noted by *plaintiff's* counsel, "[i]n the case before the Court, liability arises from the Defendants' (sic) refusal to take steps to stop an *unknown* employee from harassing plaintiff." (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, Docket # 38 at 12) When the identity of the harasser remains anonymous, *Kerans*, by its very holding, remains inapposite. As the *Kerans* Court prescribed:

> *we hold* that where a plaintiff brings a claim against an employer predicated upon allegations of workplace sexual harassment by a company employee, and where there is *evidence that the employee has a past history of sexually harassing behavior about which the employer knew or should have known, summary judgment may not be granted in favor of the employer.*

*Kerans*, 61 Ohio St.3d at 492–93, 575 N.E.2d 428 (emphasis added); *see also* RESTATEMENT (SECOND) OF TORTS § 317(b)(ii) (employer may only be negligent if it "knows or should know of the necessity and opportunity for exercising such control.") In the case at bar, there is

no evidence establishing the identity of the harasser. There is also, of course, no evidence of any past history of sexually harassing behavior about which the employer knew or should have known. As such, summary judgment would seem clearly appropriate.

In response to this reasoning, plaintiff emphasizes the next sentence in the *Kerans* opinion, to wit:

> an employer has a duty to provide its employees with a safe work environment and, thus, may be independently liable for failing to take corrective action against an employee who poses a threat of harm to fellow employees.... Whether the employer has acted appropriately in a particular situation is a factual matter to be determined on a case by case basis.

*Kerans*, 61 Ohio St.3d at 493, 575 N.E.2d 428. The court has some difficulty interpreting this language to support plaintiff's claim. Apparently, plaintiff argues that the duty to provide a workplace free from sexual harassment is violated whenever such harassment occurs. In so doing, plaintiff misses the mark. Here, we are speaking of negligence, not strict liability. The employer is duty bound to take corrective action when it is or should be aware of the need for that action. In the case at bar, the plaintiff's supervisor *removed* the pin-up pictures of *Julia Roberts*, even though plaintiff never complained. The other pictures were *hidden* behind posters and within binders and there is no proof tending to show the plaintiff's supervisor was aware or should have been aware of these items, especially in light of the fact that plaintiff never pointed them out in the first instance. Finally, we come to the remaining basis for the employer's negligence, not preventing the plaintiff from anonymously receiving lewd objects in her locker, the only harassment about which plaintiff complained. Although plaintiff's affidavit claims her supervisors laughed this off, the unrebutted deposition testimony of plaintiff and others establishes that her supervisors did take and recommend corrective action. These actions included the locking, taping and cardboarding of her

locker and the threat of immediate dismissal for anyone engaging in this conduct. On the basis of these facts, and particularly in light of the fact that the harasser remains anonymous, it is difficult for this court to conceive of any additional action the employer, AMR, could have or should have taken. Accordingly, although the determination of what corrective actions is appropriate is a "factual matter", this court must conclude, as a matter of law, that the defendant's actions in the instant case were not negligent. Although a *Kerans* analysis is clearly predicated upon an employer's knowledge of both the harasser and his proclivity to harass, even were its holding so broad as to encompass all harassing actions of a co-worker, this court must hold that the defendant herein is not negligent.

### ii. Sufficiency of the Conduct

■■■ Even if the liability of the defendant for its employee's acts were a possibility, the defendant contends that the facts alleged by plaintiff, even if taken as true, do not rise to the level of tortious conduct under Ohio law. This court agrees.

■■■ In 1983, the Ohio Supreme Court recognized the independent tort of intentional infliction of emotional distress. *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983). In so doing, the Court adopted the standard "succinctly spelled out in the Restatement". 6 Ohio St.3d at 374, 453 N.E.2d 666; *Reamsnyder v. Jaskolski*, 10 Ohio St.3d 150, 153 at note 1, 462 N.E.2d 392. Thus, one is liable for emotional distress of the plaintiff if the co-worker is:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another ...

*Id., see also* RESTATEMENT (SECOND) OF TORTS § 46. The elements of this tort have been rephrased in the subsequent manner:

> a) * * * the actor either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the plaintiff;

b) * * * the actor's conduct was extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community;

c) * * * the actor's actions were the proximate cause of the plaintiff's psychic injury; and

d) * * * the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Brandenburger v. Hilti, Inc.*, 52 Ohio App.3d 21, 29, 556 N.E.2d 212 (8th App. Dist.1989); *Penn v. Rockwell Int'l Corp.*, 1988 WL 149613, *11, 1988 U.S.Dist. LEXIS 15409, * 29 (S.D.Ohio 1988) (Holschuh, J.,). The key to liability, and the issue most vehemently debated by the parties, is whether the defendant's conduct in the instant matter rises to a level of outrageousness necessary to permit recovery. This question directs our summary judgment analysis.[9]

As a guide to determine what constitutes extreme or outrageous conduct sufficient to warrant recovery, the Ohio Court has provided the following narrative from the RESTATEMENT:

It has not been enough that the defendant has acted with an intent which is *tortious* or even *criminal,* or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of fact to an average member of the community would arouse his re-sentment against the actor and lead him to exclaim, 'Outrageous!'*

The liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Reamsnyder v. Jaskolski,* 10 Ohio St.3d at 153, 462 N.E.2d 392 (quoting RESTATEMENT (SECOND) OF TORTS § 46 (comment d)) (emphasis added). Clearly then, to say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement. *See Anthony v. TRW, Inc.,* 726 F.Supp. 175, 181 (N.D.Ohio 1989) (Aldrich, J.,) ("Ohio courts have stringently applied the intentional infliction standards in employment actions.") In light of this authority, this court must conclude that the facts proffered by plaintiff are *not so egregious* as to establish the extreme or outrageous conduct necessary to establish the tort of intentional infliction of emotional distress. As noted in previous discussion, plaintiff premises her intentional infliction of emotional distress claim upon the same facts alleged to demonstrate sexual harassment and a sexually hostile work environment. Namely, this conduct is limited to pin-ups of scantily clad celebrities in common areas, the hidden display of pictures of naked women (not engaging in sexual acts) to which plaintiff was exposed

---

9. The plaintiff contends that summary judgment on this issue is inappropriate. The court disagrees. *See Jackson v. Alert Fire & Safety Equipment Inc.,* 58 Ohio St.3d 48, 54, 567 N.E.2d 1027 (1991). ("Upon review of the record, we find that the conduct of [defendants] cannot be categorized as extreme or outrageous ... Accordingly summary judgment was properly awarded to all defendants on this claim."). *See also Crawford v. ITT Consumer Financial Corp.,* 653 F.Supp. 1184, 1192 (S.D.Ohio 1986) (Spiegel, J.,) ("[I]t is for the Court in the first instance to determine whether 'defendant's conduct may be regarded as so extreme and outrageous as to permit recovery.' ") (quoting RESTATEMENT (SECOND) OF TORTS § 46 (comment h)). ·

by co-workers, and the receipt of pornographic, explicit photographs and sex toys in her locker. Such conduct, while unseemly, is simply not, as a matter of law, "utterly intolerable in a civilized community." By way of example, the court directs plaintiff's attention to the case of *Class v. New Jersey Life Ins. Co.*, 746 F.Supp. 776 (N.D.Ill.1990). In that case, the female plaintiff's superior inflicted the following:

> regularly subjected her to sex-related jokes on a daily basis; twice told her in detail a sexual episode involving himself and two women, and another episode involving himself, a male friend and a woman; announced to the entire office staff, including plaintiff, that he would like to have sex with his girlfriend and another woman at the same time; invited plaintiff and two other women to his residence for a weekend for the implied purpose of having sex; invited plaintiff alone to his residence for a weekend for the implied purpose of having sex; asked plaintiff if she swallowed when engaging in oral sex; told plaintiff and another woman employee that he likes to engage in anal sex but that his girlfriend would not let him; and described to plaintiff and two other women how big his sex organ was.

746 F.Supp. at 778. The court, applying the RESTATEMENT standard, concluded that while the supervisor's conduct may "have been 'inconsiderate, rude, vulgar, uncooperative, unprofessional and unfair' it does not rise to intentional infliction of emotional distress on its own." *Id.* (citation omitted) This court reaches the same conclusion here. In so doing, it must be noted that the facts proffered by the instant plaintiff, right or wrong, may well not rise to the level creating a sexually hostile or offensive work environment under Title VII, the very statute designed to deal with the indignities suffered by plaintiff. *See Rabidue v. Osceola Refining Co.*, 805 F.2d 611 (6th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987).

Complaints voiced by *Rabidue* concerning the state of affairs in her work place need not be repeated verbatim here. The district court in *Rabidue*, found that the crude language combined with sexually candid posters was not sufficient to make the plaintiff's working environment offensive. *Rabidue v. Osceola Refining Co.*, 584 F.Supp. 419, 433 (E.D.Mich.1984). In so doing, the court noted that the "vulgarity merely constituted an annoying—but fairly insignificant—part of the total job environment", adding that in modern America which features the open display of erotica, "the average American should not be *legally* offended by sexually explicit posters." *Rabidue*, 584 F.Supp. at 433 (emphasis in original). On appeal, the Sixth Circuit affirmed. Over a strong dissent, it noted that "vulgar language, coupled with sexually oriented posters, did not result in a working environment that could be considered intimidating, hostile or offensive...." 805 F.2d at 622. The Circuit's conclusion is telling. It found conduct more abusive than that established in the instant case insufficient to create liability under the statute designed to prevent the very conduct complained of. The tort of intentional infliction of emotional distress requires conduct so outrageous that it is utterly intolerable in a civilized community. Clearly, then, the conduct here does not rise to that level. Accordingly, defendant's motion for summary judgment on this state law tort claim is and must be granted.

## IV. CONCLUSION

The law of this Circuit and the policies underlying Ohio's discrimination laws mandate the application of the after-acquired evidence doctrine in cases alleging the discriminatory failure to hire or discharge. This court believes that this doctrine, which bears serious implications for persons who have been discriminated against, should be used sparingly and with some healthy degree of skepticism. In the case at bar, however, the defendant has established that plaintiff would have been terminated for her misconduct. Rather than offering any proof that termination would not result, (which the court is inclined to believe is far from an impossible task), plaintiff instead has merely suggested that the

facts of this case simply do not invite application of the doctrine. In light of this posture, summary judgment on plaintiff's claims of discriminatory discharge is a necessary conclusion.

A similar conclusion is compelled on plaintiff's claim of intentional infliction of emotional distress. Even if one assumed that the conduct complained of is tortious, plaintiff's proof on this matter provides no foundation for a determination that the offending co-workers acted within the scope of their employment or that the employer was negligent. As such, the defendant simply cannot be held vicariously liable under the common law or the *Kerans* Court's modification of that law.

Accordingly, the defendant's motion for summary judgment, Docket #26, is GRANTED. This case is terminated in its entirety.

IT IS SO ORDERED.